**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| THE HERTZ CORPORATION and HERTZ GLOBAL HOLDINGS, INC., *Plaintiffs*, v. MARK FRISSORA, ELYSE DOUGLAS, and JOHN JEFFREY ZIMMERMAN, *Defendants*. |

Case No.:

Civil Action

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs The Hertz Corporation ("Hertz Corp.") and Hertz Global Holdings, Inc. ("Hertz Holdings," and together with Hertz Corp., the "Company," "Hertz," or "Plaintiffs"), by and through their undersigned counsel of record, hereby sue Defendants Mark Frissora ("Frissora"), Elyse Douglas ("Douglas"), and John Jeffrey Zimmerman ("Zimmerman"), and allege as follows.

### NATURE OF THE ACTION

1.       Hertz brings this action, pursuant to Hertz's 2010 and 2014 Compensation Recovery Policies (the "ClawBack Policies"), to recover, *inter alia*, approximately $70 million in incentive compensation paid to Defendants as a result of inappropriately inflated net pre-tax income publicly reported for its 2011, 2012, and 2013 fiscal years, causing the necessity of a restatement of the financial statements for those years (the "Restatement" or "Restatement Period"), as well as certain other damages suffered.  The Compensation Committees of Hertz's board of directors have made a good-faith determination that the Restatement was triggered by

the gross negligence and misconduct of Hertz's senior executive officers, the Defendants – that is, the very people entrusted with safeguarding the Company's financial standing – and this lawsuit is triggered by their subsequent refusal to honor the terms of the ClawBack Policies, and certain incentive compensation agreements, and return the incentive compensation paid to them.

2.      In this action, Hertz also seeks damages of more than $200 million suffered because of the inappropriately inflated net pre-tax income from its 2011, 2012, and 2013 fiscal years, the consequence of which was a lengthy and costly investigation by the Securities Exchange Commission, additional significant fees paid to Hertz's accountants, defense of class and derivative suits by shareholders, and substantial damage to Hertz's business.

3.      As indicated above, under the ClawBack Policies, Defendants are now required to forfeit their unjustly received incentive pay, together with severance that was paid to Defendants, having specifically promised to do so in the event that Hertz's Compensation Committees made a formal, good-faith determination that Defendants' mismanagement caused or contributed to the Restatement of the financial results upon which those payments were based.  The Compensation Committees made such a determination on February 11, 2019.  The ClawBack Policies expressly state that such a determination is "final, conclusive and binding on all persons . . . and employees[.]"

### SUMMARY OF DEFENDANTS' WRONGFUL CONDUCT

4.      The allegations of Defendants' gross negligence and other misconduct, as set forth in this Complaint, reflect the good-faith findings and determination of Hertz's duly established and authorized Compensation Committees, acting in the best interests of the Company and its shareholders.

2

5.      Defendants' gross negligence and other misconduct manifested itself in "an inconsistent and inappropriate tone at the top," as Hertz disclosed to its shareholders in the Restatement.  In particular, Defendant Frissora, Hertz's Chief Executive Officer ("CEO"), during fiscal years 2011, 2012, and 2013, displayed a management style and temperament that created a pressurized operating environment at the company, where there was an inappropriate emphasis on meeting internal budgets, business plans, and current estimates, which resulted in an environment which the Compensation Committees has determined led to inappropriate accounting decisions and the failure to disclose information critical to an effective review of Hertz's finances.

6.      Upon learning that Hertz might miss a financial target, Frissora would demand mandatory team-wide calls and continuous weekend meetings, and would repeatedly berate subordinates who did not come up with a sufficient number of "paradigm-busting" accounting strategies to fill the gaps between Hertz's actual and expected performance, accusing them of not being team players if they would not play his game.  Defendants Douglas and Zimmerman—Frissora's right-hand subordinates who were entrusted with effectuating his orders—failed to stop, effectively counterbalance, or otherwise offset or report to Hertz's board of directors (herein, the "Board") Frissora's inappropriately forceful tone, in breach of their duties owed to Hertz.

7.      Defendants' wrongful "tone at the top" was a form of misconduct and gross negligence because it exacerbated various risk factors, among which were:

a.      Defendants collectively employed or otherwise acquiesced in aggressive accounting to meet growth targets at a time when Hertz did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and training commensurate with

its financial reporting requirements to ensure proper selection and application of Generally Accepted Accounting Principles ("GAAP").

b.      Several major corporate endeavors were initiated by Frissora and supported by the other Defendants, including (i) Hertz's complex integration with Dollar Thrifty Automotive Group Inc. ("Dollar Thrifty"), a large competitor Hertz acquired in 2012, and its related divestiture of one of its subsidiaries; and (ii) Hertz's and Dollar Thrifty's ill-timed respective relocations from their prior headquarters to a new consolidated headquarters in Lee County, Florida, driven by Frissora, which resulted in the departure of *more than half* of Hertz's corporate office personnel.   Each of these major transitions further strained Hertz's internal controls.   Frissora, with the support of the other Defendants, nonetheless placed enormous pressure on Hertz's already-taxed internal controls while they were dealing with the impact of these major corporate initiatives.   Moreover, Frissora was wrongfully fixated on maximizing short-term profits at the expense of long-term objectives, the result of which he knew would boost his incentive compensation but, among other things, thereby degrading Hertz's fleet and damaging customer relationships.

c.      The above-described corporate endeavors were implemented by Frissora through a distracting mix of multiple, conflicting business initiatives, and a system of colliding reporting structures, reporting lines, and decisional authority responsibilities.   When combined with the pressurized operating environment set from the top down by Frissora, these created the climate in which multiple financial errors predictably occurred.

d.      Defendants significantly compromised the Company's long-term security by pushing a counterproductive aggressive agenda, doing so despite knowing full well that Hertz

was in a difficult and taxing period of corporate upheaval that strained the Company's already-inadequate internal controls.

## THE PARTIES

8.      Hertz Global Holdings, Inc. is a Delaware corporation with its principal place of business at 8501 Williams Road, Estero, Florida.  Prior to 2014, Hertz Holdings' nerve center and principal place of business was in Park Ridge, New Jersey.  Hertz Holdings is the parent corporation of Plaintiff Hertz Corporation.

9.      The Hertz Corporation is a Delaware corporation with its principal place of business in 8501 Williams Road, Estero, Florida.  Hertz Corp. retains an office in New Jersey and is a subsidiary of Hertz Holdings and operates the Hertz, Dollar, Thrifty, and Firefly vehicle rental brands, along with approximately 11,500 corporate and franchisee locations throughout North America, Central America, South America, Europe, Africa, the Middle East, Asia, Australia, and New Zealand.

10.      Mark Frissora is an individual who, upon information and belief, is domiciled in a state other than Florida or Delaware.  From July 2006 until his resignation on September 8, 2014, Frissora served as Board Chairman and CEO of Hertz Corp. and Hertz Holdings.

11.      Elyse Douglas is an individual who, upon information and belief, is domiciled in a state other than Florida or Delaware.  Douglas was employed by Hertz from July 2006 until December 2013.  She served as Senior Vice President and Treasurer from July 2006 to September 2007, and as Executive Vice President and CFO from October 2007 until her resignation on September 23, 2013.  Douglas continued to work for Hertz after her resignation, finally departing the Company on December 31, 2013.

12.     John Jeffrey Zimmerman is an individual who, upon information and belief, is domiciled in a state other than Florida or Delaware. Zimmerman served as Executive Vice President, General Counsel, and Secretary of Hertz from December 2007 until his resignation in December 2014.

### JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over the causes of action stated herein pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and Plaintiffs seek to recover damages in excess of $75,000.  Plaintiffs are Delaware corporations with their principal places of business in the state of Florida; Defendants are domiciled in states other than Florida or Delaware.

12.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this District, wherein Plaintiffs were headquartered during the great majority of the alleged wrongdoing and where Plaintiffs continue to maintain a key corporate office.

13.     This Court has personal jurisdiction over each of the Defendants pursuant to Federal Rule of Civil Procedure 4(k) and New Jersey's long arm statute. Defendants carried on business in the state of New Jersey for Hertz and engaged in gross negligence and other misconduct in New Jersey, as alleged herein.

### ALLEGATIONS

## I.     BACKGROUND

14.     Hertz and its predecessor corporations have been in the truck and car rental and leasing business since 1918, and in the equipment rental business since 1965.

15.     In July 2010, Hertz began what would become a years-long effort to acquire Dollar Thrifty, one of the larger rental car companies in the United States at the time.  Hertz

faced stiff competition from Avis Rent a Car—one of Hertz's direct competitors in the United States rental car market (along with Enterprise Rent-A-Car)—to acquire Dollar Thrifty.

16.     Dollar Thrifty targeted customers in the mid-market and budget-conscious ends of the rental car market, offering a larger variety of bargain rentals.  In an effort to penetrate the bargain rental market, Hertz had previously acquired a subsidiary known as Advantage Rent a Car.  However, in December of 2012, after defeating Avis's competing bids and completing its acquisition of Dollar Thrifty, Hertz divested itself of Advantage, which was eventually acquired by Catalyst Capital Group.

17.     From July 2010 through the Restatement Period, Hertz was in a period of enormous institutional changes related to the acquisition of Dollar Thrifty, the integration of Hertz's and Dollar Thrifty's operations, the acquisition and divestiture of Advantage, and, later, the relocation of Hertz and Dollar Thrifty to a new consolidated headquarters in Lee County, Florida and the attendant departure of *more than half* of Hertz's corporate personnel (among other things).

18.     During the Restatement Period, a majority of Hertz's directors and senior management officials were hired and/or promoted at Frissora's urging.  Defendants Douglas and Zimmerman were no exceptions.

## II.     SUMMARY OF DEFENDANTS' RESPONSIBILITIES AND INCENTIVE COMPENSATION

19.     **Mark Frissora:**  Mark Frissora was hired as Hertz's Board Chairman and CEO in July 2006, shortly before Hertz's initial public offering. Frissora presided over Hertz during a period of rapid expansion and tumultuous upheaval, including in the acquisition of Dollar Thrifty and the relocation of Hertz's headquarters from Park Ridge, New Jersey to Lee County, Florida.

a.      As CEO, Frissora was Hertz's highest-ranking executive.  In his capacity as CEO, Frissora was primarily responsible for managing Hertz's day-to-day operations, and guided the Company's major decisions, including the acquisition of Dollar Thrifty, the transition to a new accounting system, and the decision in 2013 to relocate Hertz's headquarters to Lee County, Florida.  Moreover, Frissora was responsible for setting Hertz's vision and tone, and was the Company's most prominent business figure during the Restatement Period.  Thus, it was ultimately his responsibility to ensure Hertz was adequately mitigating its financial risks.  And, as CEO, he presented Hertz's financials to the Board.

b.      As Hertz's senior-most officer, his vision for Hertz during the Restatement Period was implemented on a day-to-day basis through his subordinates, including Defendants Douglas, then the Chief Financial Officer ("CFO"), and Zimmerman, then the General Counsel ("GC").  Frissora took direct and intimidating and/or demeaning steps to instill an aggressively pro-growth culture within Hertz.  Many of Frissora's subordinates believed that his aggressive attitude placed tremendous and inappropriate pressure on his subordinates to meet financial targets.

c.      Frissora was very well compensated for his work as Hertz's CEO.  In addition to his base salary (which averaged approximately $1.3 million annually during the Restatement Period), and several valuable perquisites (including the use of company aircraft and cars), Frissora received several forms of incentive-based compensation tied to Hertz's growth and earnings.  Frissora's incentive pay included stock awards, option awards, non-equity incentive plan compensation, a well-funded pension, and other forms of valuable annual and deferred compensation.

d.   All told, Frissora received **millions** from Hertz in incentive compensation during the Restatement Period and additional compensation upon his resignation, which he expressly agreed to be treated as incentive compensation (under the Company's ClawBack Policy then in effect).

20.   **Elyse Douglas:**  Elyse Douglas was hired as Hertz's Senior Vice President and Treasurer in July 2006, at the same time Frissora was hired as CEO.  She was quickly promoted to CFO in October 2007.

a.   Douglas' responsibilities as CFO included supervising the presentation and reporting of Hertz's financial information to government agencies and shareholders, overseeing Hertz's capital structure and investments, and working with various consultants and other stakeholders to identify areas of growth for the Company.  Moreover, as Hertz's CFO, Douglas presented Hertz's financials to the Board.

b.   Douglas was Frissora's right-hand fellow executive during the Restatement Period.  She was hired at the same time as Frissora, just before Hertz's November 2006 initial public offering, and Frissora quickly promoted her to CFO less than a year later.  She played key roles implementing the major corporate changes Hertz underwent during the Restatement Period, including the Dollar Thrifty merger and the transition to a new accounting system.

c.   Douglas also worked hand-in-hand with Frissora in ensuring the Company met its aggressive targets for growth.  As CFO, she was primarily responsible for, and had direct oversight of, Hertz's financial review processes and ensuring Hertz was adequately mitigating financial risks.  Her reports were also responsible for approving Hertz's accounting changes and methodologies.    Yet,  she  consistently  deferred  to  Frissora  and  wrongfully  failed  to

counterbalance the obvious pressure he was putting on subordinates to meet financial targets – even if it meant using questionable accounting methodologies.  Nor did Douglas fulfill her obligation to inform the Audit Committee or the Board of any of that misconduct.

d.      Like Frissora, Douglas received a large base salary, several valuable perquisites, and many forms of incentive-based compensation tied to Hertz's growth and earnings and additional compensation upon resignation.

21.  **John Jeffrey Zimmerman:**  During the Restatement Period, Zimmerman served as Hertz's Executive Vice President, General Counsel, and Secretary.

a.      As Hertz's General Counsel, Zimmerman was charged with ensuring that Hertz, its officers, and its employees acted lawfully and consistently with their duties and obligations.  Moreover, Zimmerman had the responsibility to ensure that the Company remained compliant with its reporting obligations to various government agencies and to shareholders, that it did not breach any covenants made to third parties including outside lenders, and that the Board and relevant committees would be kept fully informed of all material matters.

b.      As General Counsel, Zimmerman was well aware of various governance, accounting and financial weaknesses.  For example, he was aware of possible improper payments to Brazilian government officials, but failed to disclose what he knew to the Board.

c.      Moreover, Zimmerman was aware of weaknesses within the finance and accounting organizations, pressures on those organizations, and certain accounting changes or requests for changes. For example, during the January 2013 close, Frissora urged Zimmerman to conduct a granular review of the legal reserves to help the Company "bridge the gap" for year-end results.  Then, in September 2013, Frissora again urged Zimmerman to review legal reserves

to help close the quarter, saying he was "interested in taking things to trial where we have a better than 50-50 shot and reversing the settlement accrual."

> d.    As General Counsel and chief compliance officer, Zimmerman was responsible for ensuring the accuracy and completeness of disclosures to stockholders and the public.

> e.    Zimmerman's compensation reflected the importance of his responsibilities. He received a large base salary, several valuable perquisites, and many forms of incentive-based compensation tied to Hertz's growth and earnings.  In addition, Zimmerman received additional compensation when he resigned, which he expressly agreed would be treated as incentive compensation (under the Company's ClawBack Policy then in effect).

## III.    OTHER KEY SENIOR EXECUTIVES

22.    **Scott Sider**: Sider served as Hertz's Group President for Rent-A-Car Americas ("RAC Americas") during the Restatement Period.  RAC Americas refers to the core of Hertz's business model:  the renting of passenger vehicles within the United States.

23.    As Group President for RAC Americas, Sider was primarily responsible for the day-to-day operations of Hertz's core business – Hertz's passenger rentals within the United States. As such, he was frequently in direct contact with Frissora.

24.    **Jatindar Kapur:** Kapur served as Hertz's Senior Vice President of Finance and Corporate Controller during the Restatement Period.

25.    Kapur's responsibilities as Hertz's Corporate Controller and V.P. for Finance included directly supervising (alongside Defendant Douglas) Hertz's financials, the Company's "closing" of various accounting periods—in which the numbers are finalized before financial

reports are completed—and overseeing Hertz's efforts to resolve and document accounting issues, financial risks, and other potential problems.

## IV.   DEFENDANTS' GROSS NEGLIGENCE AND MISCONDUCT

### A.  Defendants Materially Weaken Hertz's Internal Controls

26.    Hertz's size and complexity—both before and after the Dollar Thrifty acquisition—meant that the Company needed to have strong internal controls to prevent mismanagement and faulty accounting practices from slipping through the cracks.

27.    However, during the Restatement Period, Hertz suffered from numerous material deficiencies in internal controls that Defendants were aware of yet failed to correct.  These deficiencies predictably made it inevitable that Frissora's unchallenged aggressive push for profits would result in financial misstatements. These deficiencies included, but are not limited to: (a) inappropriate tone at the top; (b) insufficient personnel with a lack of training, knowledge, and experience commensurate with financial reporting requirements; (c) lack of organizational structure; (d) ineffectively designed controls over non-fleet procurement process; (e) ineffectively designed controls over accounting estimates; (f) ineffectively designed controls over the review, approval, and documentation of manual journal entries; (g) ineffective controls over GAAP policies and procedures; (h) ineffective controls in response to the risks of material misstatement; (i) insufficient controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments; (j) ineffective process for internal communication between accounting and other departments within the business; and (k) ineffective internal audit function.

28.    More specifically, Defendant Douglas, Hertz's CFO, had minimal experience as the Company's Treasurer before her promotion to CFO.  Her subordinates similarly lacked experience in GAAP, including Hertz's head of internal finance services

29.     Frissora was also aware of these deficiencies.  He not only hired and promoted Douglas but received frequent Human Resources summaries as CEO, which informed him about "the general environment in Finance," where employees were "overworked," suffered from "a lack of communication," and were beset by other significant concerns.

30.     These personnel risk factors were exacerbated by two other powerful factors: (a) the departure of a substantial number of personnel when Hertz began its ill-timed relocation of its operations in Lee County, Florida (reducing the size of its Park Ridge, New Jersey offices); and (b) the early retirement of a substantial number of senior personnel in 2011 and 2012 under Hertz's early retirement program.

31.     Ultimately, throughout the Restatement Period, during which Defendants sought the review of an enormous number of major accounting changes, Hertz lacked appropriately trained accounting review personnel throughout its corporate structure.  This deficiency was the result of Defendants' effort to aggressively cut costs, which resulted in reduced head-count for their financial review teams and contributed to Hertz's inability to hire appropriately qualified, GAAP-trained accounting personnel.

32.     Moreover, Hertz's financial review team was under substantial strain during the Restatement Period, during which Hertz underwent a series of corporate changes including the acquisition of, and integration with, Dollar Thrifty, the acquisition and divestiture of Advantage, the dislocation and employee turnover caused by the Company's relocation to Lee County, Florida beginning in May 2013, and the expansion of Hertz's retail car sales outlets.

33.     The deficiencies associated with Hertz's under-qualified and overtaxed review team were compounded by Hertz's lack of a centralized accounting system during the

Restatement Period, a substantial number of critical accounting decisions were left to the subjective judgments of accounting personnel, exacerbating existing control deficiencies.

34.    Rather than delay the integration of the new accounting system, or otherwise ensure that the existing control deficiencies were not so exacerbated, Defendants chose to push for major changes in its accounting processes at precisely the same time Hertz underwent the major, complicated corporate changes discussed above.   Doing so further strained Hertz's internal controls.

35.    On top of the foregoing control deficiencies, Hertz suffered throughout the Restatement Period from a lack of overall clarity regarding which departments were actually responsible for accounting changes, judgments, and policies.  Hertz had Finance Shared Services personnel in Oklahoma City, Divisional and Fleet Accounting personnel in different countries and business units, accountants working in the Corporate Controller office, and finance business partners.  There were frequent issues with authority and jurisdiction between these groups, which Defendants failed to correct.  Chain-of-command issues contributed to several of the accounting errors that lead to the Restatement, as several critical changes were not appropriately vetted.  Moreover, it enabled various stakeholders, including Defendants, to point fingers at others rather than accept responsibility for errors.

36.    Moreover, Defendant Douglas' poor managerial style failed to remediate these overlapping command hierarchies.  As Frissora learned from Human Resources managers within Hertz and then wrote in an e-mail that

> "[t]he communication within [Hertz's finance department] is not good," because "several different directives are relayed by Elyse's lieutenants after a staff meeting . . . and those directives are often diametrically opposed.  This leads to frustration as the staff is forced to do multiple tasks knowing most of them are in vain. Requests for clarification from the staff to her direct reports are

often unanswered and there is a **fear to go to Elyse directly** because of the potential ramifications of going over a direct supervisor's head. **In fact, most feel they are always on the 'firing line.'  The culture is generally fear based.  The staff does not like being in meetings with Elyse or their direct supervisors as the meetings tend to lead to fits of yelling**." [Emphasis added.]

37.     As a result of Defendants' poor management, Hertz's financial review personnel were "bordering on burn out (if not already there)" because "[c]ommunication [was] not good," and "[m]orale [was] not good."  Indeed, Hertz's Human Resources personnel noted that the financial review teams "fe[lt] the current work processes [were] flawed," and that they were "penalized for asking questions."  Defendants plowed forward with their aggressive cost-cutting agenda despite knowing the extent of these risk factors.

38.     Ultimately, Defendants, the Company's senior-most officers, were responsible for streamlining its hierarchy and ensuring the appropriate review of accounting changes.  Their failure to do so constituted gross negligence and misconduct contributed to the need for the Restatement.

39.     All told, Defendants caused, and contributed to the worsening of, each of the foregoing deficiencies by and through their gross negligence and misconduct.

40.     The aggressive tone and the deficiencies described above "reached a boiling point" during the Restatement Period, in the words of one Hertz employee, who noted that there was tremendous "pressure" being applied (particularly by Frissora) to improve numbers and that it had placed incredible strain on his review team.  Thus, Frissora's decision, acquiesced in by the other Defendants, to keep pushing for aggressive cost-cutting measures—despite their direct contributions to the foregoing deficiencies—crossed the line into gross negligence and misconduct during the Restatement Period.

**B.  Accounting Wrongdoing Caused or Contributed to by Defendants**

**1.  Tone at the Top**

41.     In significant part, the accounting errors and need for the Restatement were due to the inappropriate "tone at the top," which misconduct precipitated Defendants' grossly negligent mismanagement of the Company. The following examples are illustrative of the inappropriate "tone at the top" set by Frissora, which Douglas and Zimmerman fueled and/or failed to counterbalance or otherwise challenge.

a.     Frissora would, on a consistent basis, aggressively seek "opportunities" to increase earnings and promote eleventh hour (near the close of a financial reporting period) efforts to "close the gap."

b.     One such change—later identified in the Restatement—was to extend the amortization period on Hertz's vehicles.  Such a change would permit Hertz to spread out costs of the vehicles in its fleet, reducing monthly expenses by dividing the total amount of depreciation over a longer period of time.  In particular, Defendants' subordinates zeroed in on increasing the amortization period for vehicle registration and title fees as a way of quickly cutting costs.

c.     One challenge with establishing amortization periods for vehicle registration and license fees is that the period can be different in each U.S. state or municipality, and it was difficult to obtain information on a car-by-car or jurisdiction-by-jurisdiction basis for vehicle licenses and registrations.  Hertz therefore used estimates for amortization periods.  At the beginning of the Restatement Period, the amortization period was 16 months.

d.      However, Hertz's accounting personnel were unable to obtain data to develop sufficient documentation of the basis for extending the depreciation period on vehicle license and registration fees.

e.      Nonetheless, the vehicle license and registration period extension was sent directly to Douglas as a way to "bridge" Hertz's financial gap.  Hertz ultimately extended the amortization period to 18 months, cutting $1.5 million in costs from their books.

f.      Frissora initiated a related change, to wit, retaining existing vehicles for longer periods of time.  This change would result in short-term savings—for example, by extending the planned holding period for the vehicles, losses could be deferred in what was a declining market.  Moreover, the strategy came with adverse long-term costs, including a reputational cost because Hertz's customers expected cars to be newer, lower-mileage vehicles. The decision to shift a greater percentage of Hertz's fleet into a longer planned holding period would result in not only lower depreciation rates, but also lower customer satisfaction.  However, Defendants approved the change in planned holding periods for parts of the fleet despite these risks.

g.      These and other financial and accounting changes were promoted and approved by Douglas with the active consent and encouragement of Frissora and the grossly negligent failure of Zimmerman to inform the Board and take corrective action.

**2.  Defendants' Misconduct and Gross Negligence Necessitated The Restatement Of More Than $200 Million In Hertz's Pre-Tax Income**

42.  In or about November 2014, the Company, with the advice of its outside auditors, determined that a restatement of its financials from fiscal years 2011, 2012, and 2013 would be needed.

a. The Restatement, filed with the SEC on July 16, 2015, disclosed that the "**material weaknesses**" in the Company's internal controls—which were caused and/or exacerbated by Defendants' mismanagement—"**resulted in certain instances of inappropriate accounting decisions and inappropriate changes in accounting methodology,**" and that, in particular, Hertz had not "design[ed] effective controls over . . . period-end financial reporting processes," such as the "closing adjustments[.]" [Emphasis added.]

b. Hertz (with the assistance of its outside auditor) concluded that its "**incorrect accounting was caused by the foregoing control deficiencies**, along with a complex mix of structural and environmental factors," which explicitly included: (i) "**the tone set and pressures imposed** by our former Chief Executive Officer, which . . . may have been a factor influencing one or more employees to record an accounting entry now determined to be improper; (ii) "**the overall historic accounting environment**" within Hertz; and (iii) "the **distraction caused by the multiple, conflicting business initiatives**; challenges related to managing **complex, inefficient legacy systems**; the **lack of a sufficient complement of personnel with an appropriate knowledge, experience, and training with GAAP**; [and] **unclear reporting structures**." [Emphasis added.]

c. Defendants were responsible not only for Hertz's material control deficiencies but for the inappropriate "tone at the top;" failing to ameliorate Hertz's "accounting environment," which was beset with personnel problems and poor morale; imposing the distraction of "multiple, conflicting business initiatives;" *and* the distraction caused by the enormous corporate upheaval Hertz underwent during the Restatement Period. "As a result of the foregoing . . . [Hertz] restated [its] financial statements for the years ended December 31,

2012 and 2013," and "restated unaudited selected financial data for the year ended December 31, 2011."

43.   All told, the Company's July 16, 2015 Restatement identified **accounting errors**, broken into six broad categories: (a) reserve accounts, (b) fleet adjustments, (c) fixed asset adjustments, (d) Brazil issues, (e) improper accounting reclassifications, and (f) other adjustments.   In the end, "[t]he cumulative impact of the . . . misstatements . . . was approximately a **$349 million in pre-tax income and $231 million reduction in net income**." [Emphasis added.]

44.   The plethora of accounting errors are described in detail in Hertz's Form 10-K filing for year ended December 31, 2014, an excerpt from which is attached to this Complaint as **Exhibit 1**.

45.   In addition, after a lengthy investigation, the SEC issued an "Order Instituting Cease-And-Desist Proceedings Pursuant To Section Sa Of The Securities Act Of 1933 And Section 21c Of The Securities Exchange Act Of 1934, Making Findings, And Imposing A Cease And Desist Order" ("SEC Order")**,** which among other things, sets forth findings of the SEC regarding the accounting errors, which caused the necessity of the Restatement.   Those accounting errors were caused or contributed to by the gross negligence and misconduct of each of the Defendants. The SEC Order is attached to this Complaint as **Exhibit 2** and incorporated by reference in these allegations.

## V.   DEFENDANTS' RESIGNATIONS AND RELATED AGREEMENTS

46**.   Defendant Douglas:**   The first of the Defendants to resign was Douglas, whose formal resignation was to be effective on October 1, 2013.   However, Douglas continued her work for the Company until December 31, 2013, including work related to the Company's

financial statements for the third and fourth quarters of 2013, and the lead-up to the auditing of its fiscal year 2013 financials.

47.    Upon Douglas' resignation, she and Hertz entered into a Separation Agreement on or about September 23, 2013. The Separation Agreement provided certain severance and related benefits (the "Golden Parachute").

48.    **Defendant Frissora:**  Shortly after the Audit Committee directed its first internal review of Hertz's financials, and as the Company began investigating the mismanagement that would ultimately lead to the Restatement, Frissora tendered his resignation on September 8, 2014. Shortly before his resignation, the SEC informed Hertz in June 2014 that its financials were under investigation.

49.    Upon Frissora's resignation, he and Hertz entered into a Separation Agreement, which provided him with a Golden Parachute.

50.    Frissora's Golden Parachute included, *inter alia*, a single lump-sum payment, the retention of certain incentive-based equity awards, eligibility for 68% of his 2014 bonus, and the continued use of certain perquisites such as car privileges and insurance coverage.

51.    **Defendant Zimmerman:**  The last of the Defendants to resign their position in the Company was Zimmerman, who resigned on December 5, 2014, shortly after the Audit Committee concluded that a formal restatement would be necessary, and informed Hertz's shareholders of the same.

52.    Upon Zimmerman's resignation, he and Hertz entered into a Separation Agreement, which provided him with a Golden Parachute.

53.     Zimmerman's Golden Parachute included, *inter alia*, a series of lump-sum payments, the retention of certain incentive-based equity awards, eligibility for 92.9% of his 2014 bonus, and the continued use of certain perquisites such as insurance coverage.

## VI.   DAMAGES

54.     As a result of Defendants' misconduct and grossly negligent mismanagement of Hertz, the Company predictably suffered four significant additional consequences beyond the stark decrease in the public value of the Company and the impact on Hertz's reputation with customers and the investing public.  Those negative consequences were: (1) the impact of several securities class-action lawsuits filed against Hertz; (2) the costs of investigating and defending against multiple shareholder derivative demands, one of which has resulted in ongoing litigation; (3) the effect of four separate federal and state government investigations; and (4) the cost to Hertz to remedy the continuing impact of Defendants' prior misconduct and (grossly negligent) mismanagement, including increased costs of financing.

55.     **Securities Lawsuits:**  On November 20, 2013, the action styled *Ramirez, Jr. v. Hertz Global Holdings, Inc. et al.*—the first action filed in connection with certain consolidated securities cases filed against Hertz (herein, "Ramirez")—was commenced against Hertz, Frissora, and Douglas.  *Ramirez* was a class-action lawsuit on behalf of investors who held shares in Hertz during a period including the Restatement Period.  The class-action plaintiffs alleged that Hertz and the individual defendants made material misstatements about the Company's financial well-being and its internal controls.  The class-action plaintiffs sought the recovery of hundreds of millions of dollars in damages.

56.     Over the course of Hertz's successful legal defense against the plaintiffs' claims, five separate complaints were withdrawn or dismissed in *Ramirez*.  On April 27, 2017, Hertz secured a final dismissal with prejudice of the plaintiffs' claims.  That final dismissal was later

21

affirmed by the U.S. Court of Appeals for the Third Circuit on September 20, 2018. However, the *Ramirez* plaintiffs have recently filed a motion seeking relief from the dismissal order based on the SEC findings appearing in the SEC Order, in conjunction with a settlement, pursuant to which Hertz paid a $16 million settlement to the SEC.

57. Hertz's thus-far-successful legal defense came, of course, at significant expense—more than $25 million—because of Defendants' gross negligence and misconduct, as aforesaid.

58. **Shareholder Derivative Demands:** As a result of Defendants' wrongdoing, Hertz's Board received books and records and derivative demands from multiple shareholders. Hertz incurred legal fees as a result of its document productions, investigations, and responses to these demands.

59. Hertz and its Board complied with all applicable duties in investigating and responding to the demands.

60. One demand resulted in a shareholder derivative lawsuit filed on May 30, 2018 against the Company, members of its Board, and Frissora and Douglas in the Court of Chancery for the state of Delaware. Therefore, as a result of Defendants' misconduct and grossly negligent mismanagement, the Company and its Board remain in legal jeopardy from this lawsuit and other potential shareholder derivative lawsuits.

61. **Federal and State Government Investigations:** As a result of Defendants' misconduct and grossly negligent mismanagement, Hertz also faced significant legal liability from two separate federal government investigations, and one state government investigation.

62. *First*, in June 2014, the SEC informed Hertz that it was under investigation with respect to certain financial improprieties, including material misstatements. As a result, the Company underwent an invasive and otherwise burdensome investigation by the SEC, with

which it cooperated.  On December 31, 2018 Hertz settled with the SEC and paid $16 million dollars to the SEC as a result of the accounting errors detailed in the SEC's findings and this Complaint, and issued the SEC Order, referenced above and attached as Exhibit 2.

63.     *Second*, in June 2016, Hertz learned that the U.S. Attorney's Office for the District of New Jersey ("NJUSAO") was investigating the Company as well.  As a result, the Company similarly underwent an invasive investigation by the NJUSAO.

64.     *Third*, in December 2014, the New Jersey Bureau of Securities informed Hertz that it was under investigation, likewise for financial improprieties, including material misstatements.  As a result, the Company underwent an invasive investigation by the New Jersey Bureau of Securities.

65.     **ClawBack Damages.**  ClawBack Damages are owed as a result of Defendants' wrongful refusal to return the compensation amounts Hertz has demanded from them, which amounts they are clearly required to return under the terms of the ClawBack Policies and the various agreements pursuant to which they received such monies (that  is, certain "Performance Stock Unit" agreements, "Employee Stock Option" agreements, "Price Vested Stock Unit" agreements and Separation Agreements, which expressly note that those payments were made subject to those agreements).

66.     During the Restatement Period, Defendants, in total, received more than seventy million dollars in incentive-based compensation.  Hertz's Compensation Committee has voted in favor of reclaiming *all* available incentive compensation—as they are entitled to seek under the ClawBack Policies.

67.     Separate from their available incentive compensation during the Restatement Period, each of the Defendants also received certain other incentive-based compensation as a part

of their Separation Agreements, including their Golden Parachutes discussed above. The Compensation Committees have also voted in favor of reclaiming Defendants' Golden Parachutes.

68.     The Committees' decision to demand the return of such monies is proper because the Board's Compensation Committee determined in good faith, pursuant to the ClawBack Policies, that it was in the best interests of the Company and that Defendants' misconduct and gross negligence "caused or contributed to" the need for the Restatement.  Defendants' disregard for the substantial risk factors *they created* in pursuit of aggressive cost-cutting triggered the need for the Restatement.  Defendants' aggressive growth strategy, in combination with Hertz's materially deficient internal controls which they failed to correct, led to the accounting errors, which necessitated the Restatement.

69.     The Committees' decision to demand return of such monies is also proper under the ClawBack Policies because Hertz identified the need for the Restatement within three years of the public filing of the first financials subject to the Restatement—Hertz's fiscal year 2011 Form 10-K, which was filed February 27, 2012.  Hertz's Audit Committee identified the need for the Restatement in early November 2014, and informed shareholders of the need for the Restatement shortly thereafter.  Thus, Hertz identified the need for the Restatement within three years of the filing of its fiscal year 2011 financials, and well within three years of the filing of its fiscal year 2012 and 2013 financials.

70.     And, the Committees' decision to demand return of Golden Parachutes is also proper under the 2014 ClawBack Policy.

71.     **Other Contract Damages.** In addition, Defendants Frissora and Zimmerman represented in each of their Separation Agreements, among other things, that they had not

"engaged in any conduct that constitutes willful gross neglect or willful gross misconduct with respect to [their] employment duties with [Hertz] which has resulted or will result in material economic harm" to Hertz, and that [they] had not "facilitated . . . and ha[ve] no knowledge of, any financial or accounting improprieties or irregularities."  Those representations were false—as they *had* engaged in grossly negligent conduct and knew of accounting improprieties and irregularities, as described above—and constituted a breach of such contracts.

72.     Frissora and Zimmerman further "acknowledge[d] and agree[d]" that Hertz entered into the Separation Agreements "in reliance on th[ose] representations . . . which constitute terms of th[ese] Agreement[s]."

73.     Thus, Frissora and Zimmerman are liable to the Company for such amounts as are a result of their breaches of the Separation Agreements, including but not limited to:

a.      Legal Fees & Related Expenses:  Hertz has incurred significant legal fees and expenses for the Company's internal investigation and the cost of responding to the lawsuits and investigations initiated by the securities plaintiffs, the SEC, the NJUSAO, the New Jersey Bureau of Securities, and shareholder derivative plaintiffs.  Those fees and expenses include but are not limited to fees and expenses paid to lawyers, experts, consultants, or other agents retained on their behalf, and attendant costs related thereto, such as document database hosting fees and maintenance.

b.      Auditor Review Costs: As a part of Hertz's internal investigation, Hertz suffered the burden of significant costs related to their auditor's subsequent internal review of the Company's finances and fees paid to others to further investigate the Company's finances and the breakdowns in controls that lead to the Restatement.

c.      Heightened Costs of Subsequent Audits:  As a result of the Restatement, Hertz's independent auditor must conduct significantly more invasive/burdensome audits than it had in years past.

d.      Costs of Financing Waivers:  As a result of the Restatement, and the attendant delays in filing the Company's 2014 fiscal year financials with the SEC, Hertz was in danger of breaching "timely filer" and other similar covenants in its debts with third-parties.  To avoid breaching its financing arrangements and possibly accelerating the Company's debts, Hertz was forced to secure—at significant cost—waivers for any "timely filer" violations.

e.      Higher-Than-Necessary Taxes: Defendants' wrongful conduct caused Hertz to report in excess of $200 million in additional pre-tax income to local, state, and federal tax assessors.  As a result, Defendants' mismanagement resulted in significantly inflated tax liabilities for the Company throughout the Restatement Period.

74.      Outside of these quantifiable damages, the Company has suffered from significant other costs stemming from the Restatement, including the enormous negative impact Defendants had on the Company's market capitalization and the distraction of management's attention from running the core business to addressing the Restatement processes and related investigations.

75.      All told, the costs to the Company resulting from the remediation of the Restatement matters continue to this day.  Defendants' wrongful conduct and gross negligence has damaged Hertz in excess of $200 million to-date.

## COUNT I

**BREACH OF CONTRACT:  Enforcement of the 2010 ClawBack Policy to recover incentive-based compensation from fiscal years 2011, 2012, and 2013 (against all Defendants)**

76.      Plaintiffs repeat and reallege the allegations set forth above, as though fully set forth herein.

77. The ClawBack Policy adopted by Hertz in 2010 provides that,

all determinations and decisions made by the Compensation Committee pursuant to the provisions of this Compensation Recovery Policy shall be ***final, conclusive and binding*** on all persons, including the Company, its affiliates, its stockholders and employees. [Emphasis added.]

78. The 2010 ClawBack Policy generally provides that Hertz's "executive officer[s]" receiving "any annual incentive, long-term incentive, equity-based award or other performance-based award . . . shall repay or forfeit . . . any [such compensation] received by him or her if" four conditions are met:

a. "[T]he payment, grant or vesting of such [incentive-based compensation] was based on the achievement of financial results that were the subject of a restatement . . . as filed with the Securities and Exchange Commission []";

b. "[T]he need for the restatement was identified within 3 years after the date of the … filing of the financial results that were subsequently restated";

c. "[T]he Compensation Committee determines in its ***sole discretion***, exercised in good faith, that the executive officer's ***gross negligence***, fraud or misconduct caused or contributed to the need for the restatement[]"; *and*

d. "[T]he Compensation Committee determines in its ***sole discretion*** that it is in the best interests of the Company and its stockholders for the executive officer to repay or forfeit ***all or any portion of*** the [incentive-based compensation]." [Emphasis added.]

79. The terms of the 2010 ClawBack Policy were made clear in various valid and enforceable written agreements which were fully performed by Hertz, and pursuant to which such compensation was awarded to Defendants (that is, certain "Performance Stock Unit"

agreements, "Employee Stock Option" agreements, and "Price Vested Stock Unit" agreements), and were otherwise known, understood, and agreed to by each of the Defendants.

80.  At all relevant times, Defendants were "executive officers" of Hertz subject to the Company's 2010 ClawBack Policy (which remained in effect until amended and restated in 2014).

81.  For the 2011, 2012, and 2013 fiscal years, Defendants each received a substantial amount of incentive-based compensation covered by the 2010 ClawBack Policy, which covered incentive-based compensation paid on or after January 1, 2010.  In total, Defendants received more than $70 million in incentive-based pay during this period.

82.  The Compensation Committee determined in good faith that the incentive-based compensation received by Defendants for the 2011, 2012, and 2013 fiscal years was "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement.

83.  Hertz identified "the need for the restatement" in November 2014, which was "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

84.  Based on Defendants' misconduct as set forth above, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Defendants'] gross negligence . . . or misconduct caused or contributed to the need for the restatement," which determination was final, conclusive, and binding on Defendants, and was reflected in a resolution passed on February 11, 2019.

85.     Likewise, Hertz's Compensation Committee determined that "it is in the best interests of the Company and its stockholders for [Defendants] to repay or forfeit ***all***" of their inventive-based pay from fiscal years 2011, 2012, and 2013.  [Emphasis added.]

86.     On February 13, 2019 counsel for Hertz contacted counsel for each of the Defendants, informing them of the Compensation Committees' decision and seeking the prompt return of their incentive-based compensation from fiscal years 2011, 2012, and 2013.

87.     Defendants, through their counsel, refused to comply with their obligations under the 2010 ClawBack Policy.

88.     Accordingly, Defendants have materially breached their obligations under the 2010 ClawBack Policy, and their various incentive compensation agreements, by failing to remit their incentive-based compensation from fiscal years 2011, 2012, and 2013.

89.     As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return.

## COUNT II

**BREACH OF CONTRACT:  Enforcement of the 2010 ClawBack Policy to recover incentive-based compensation in Douglas' Golden Parachute (against Defendant Douglas)**

90.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

91.     Douglas was party to a valid, enforceable contract entered into with Hertz upon Douglas' anticipated termination from Hertz, namely, Douglas' Separation Agreement.

92.     Hertz has performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of Douglas' Separation Agreement.

93.     As a part of Douglas' Separation Agreement, Douglas received certain incentive-based compensation as a part of her Golden Parachute.

94.     Hertz's Compensation Committee determined in its sole discretion, exercised in good faith, that the incentive-based compensation received by Douglas as part of her Golden Parachute was "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement of its fiscal year 2011, 2012, and 2013 financials.

95.     Hertz identified "the need for the restatement" in November 2014 "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

96.     Based on her misconduct and gross negligence as set forth above, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Douglas'] gross negligence . . . or misconduct caused or contributed to the need for the restatement," which determination was final, conclusive and binding on Douglas and reflected in a resolution passed on February 11, 2019.

97.     The ClawBack demand letter of February 13, 2019, described above, includes the incentive-based compensation paid prior to February 20, 2014.

98.     Accordingly, Douglas has also materially breached her obligations under the 2010 ClawBack Policy by failing to remit her incentive-based compensation received through her Separation Agreement's Golden Parachute.

99.     As a result of such breach, Hertz has been damaged, at a minimum, in the amount of the demanded Golden Parachute monies Douglas has wrongfully refused to return.

<u>COUNT III</u>

**BREACH OF CONTRACT:  Enforcement of 2014 ClawBack Policy to recover incentive-based compensation in Defendants' Golden Parachutes (against all Defendants)**

100.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

101.    As a part of Defendants' Separation Agreements, Defendants received certain incentive-based compensation as a part of their Golden Parachutes, which was paid on or after February 20, 2014.

102.    Hertz's Compensation Committee determined in its sole discretion, exercised in good faith, that certain of the incentive-based compensation received by Defendants through the Golden Parachutes in their Separation Agreements were "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement.

103.    Hertz identified "the need for the restatement" in November 2014 "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

104.    Based on Defendants' misconduct and gross negligence as set forth above, and on the ClawBack Policy as amended and restated in 2014, which also applied to Defendants, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Defendants'] gross negligence . . . or willful misconduct caused or contributed to the need for the restatement," which determination was final, conclusive, and binding on Defendants and reflected in a resolution passed on February 11, 2019.

105.    The ClawBack demand letters of February 13, 2019, described above, include the incentive-based compensation paid subject to the amended and restated ClawBack Policy in effect in 2014.

106.    Accordingly, Defendants have materially breached their obligations under the 2010 ClawBack Policy, by failing to remit their incentive-based compensation as a part of their Golden Parachutes, which was paid on or after February 20, 2014.

107.    As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return.

## COUNT IV

**BREACH OF CONTRACT:   Breaches of Separation Agreement Representations (against Defendants Frissora and Zimmerman)**

108.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

109.    Frissora and Zimmerman each entered into a valid, enforceable contract with Hertz, namely, each individual's Separation Agreement.

110.    Each Separation Agreement contained certain representations, which were explicitly incorporated as terms of that Separation Agreement.

111.    The terms of Frissora's Separation Agreement are governed by Florida law. The terms of Zimmerman's Separation Agreement are governed by Delaware law.

112.    Hertz has performed all of the material conditions, covenants, and promises to be performed in accordance with the terms and conditions of the Separation Agreements.

113.    Frissora and Zimmerman represented in their respective Separation Agreements that they had not engaged in "willful gross neglect" or "willful gross misconduct."

114.    Frissora and Zimmerman further represented in those agreements that they had not "facilitated … and ha[ve] no knowledge of, any financial or accounting improprieties or irregularities" within Hertz.

115.   Frissora and Zimmerman also therein "acknowledge[d] and agree[d]" that Hertz had entered into their Separation Agreements "in reliance on the[se] representations," which were explicitly incorporated as terms of the Separation Agreements.

116.   As evidenced by their misconduct described above, Frissora's and Zimmerman's representations were false because they did engage in "willful gross neglect" and/or "willful gross misconduct" with respect to their employment duties with Hertz, which resulted in material economic harm to Hertz, and also because they knew of and/or "facilitated . . . financial or accounting improprieties," including but not limited to those identified in the Restatement.

117.   As evidenced by their misconduct described above, Frissora's and Zimmerman's representations were false, as they engaged in "willful gross neglect" and/or "willful gross misconduct" with respect to their employment duties with Hertz, and "facilitated . . . financial or accounting improprieties," including but not limited to those identified in the Restatement, both of which resulted in material economic harm to Hertz.

118.   Accordingly, as a result of their misrepresentations made in those contracts, Frissora and Zimmerman have materially breached their Separation Agreements.

119.   Hertz has suffered damages in excess of $200 million as a proximate result of Frissora and Zimmerman's breaches of their Separation Agreements.

## COUNT V

**Declaratory Judgment Denying Advancement of Expenses (against all Defendants)**

120.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

121.   Each of the Defendants received incentive compensation that was subject to the ClawBack Policies.

122.    That such compensation was subject to the ClawBack Policies was expressly made clear in various valid and enforceable written agreements, which were fully performed by Hertz and pursuant to which such compensation was awarded (that is, certain "Performance Stock Unit" agreements, "Employee Stock Option" agreements, "Price Vested Stock Unit" agreements, and Separation Agreements), and was otherwise known, understood and agreed to by each of the Defendants.

123.    Pursuant to the ClawBack Policies, and resolutions of the Compensation Committees of Plaintiffs' Boards of Directors, Plaintiffs have demanded return of certain incentive compensation awarded to Defendants.

124.    Each of the Defendants has refused to return the incentive compensation demanded from him, thereby dishonoring his repayment obligations, in breach of the ClawBack Policies and the agreements pursuant to which he received such monies.

125.    The ClawBack Policies expressly provide that the Compensation Committee's determination is binding and conclusive, and that Plaintiffs may, to the extent permitted by law, enforce each Defendant's repayment obligation thereunder "by reducing any amounts that may be owing from time-to-time by" them to such employee, "whether as wages, severance, vacation pay or in the form of any other benefit or for any other reason" (herein, the "ClawBack Enforcement Provision").

126.    Each of the Defendants has made a demand for advancement of expenses, including legal fees, under Section 6.01 of Article VI of Plaintiffs' Amended and Restated By-Laws.

127.    Plaintiffs maintain that Defendants are not entitled to indemnification and that in any event, they are not entitled to advancement of expenses in a contract-based action that they were compelled to bring against an officer or director.

128.    Plaintiffs also maintain that, even if the By-Laws' provision for advancement of expenses did apply in a contract-based action brought by them against an officer or director, advancement is inconsistent with, and effectively rendered nugatory here by, the ClawBack Enforcement Provision, as it expressly permits Plaintiffs to "reduc[e] any amounts that may be owing from time-to-time by" them to such employee.

129.    An actual dispute and controversy exists over whether Defendants are entitled to advancement of expenses.

130.    Plaintiffs are entitled to a declaratory judgment that Defendants are not entitled to advancement of expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

A.      Awarding compensatory damages to Plaintiffs, jointly and severally, in an amount to be proven at trial, including amounts equal to Defendants' ill-gotten incentive pay and the investigation and remediation costs borne by Plaintiffs as a result of Defendants' wrongful conduct, including pre- and post-judgment interest;

B.      Awarding restitution and disgorgement of Defendants' ill-gotten incentive pay and other profits;

C.      Declaring that Defendants are not entitled to indemnification by Plaintiffs for any attorney's fees, costs, and/or any other liability incurred as a result of this litigation;

D.      Declaring that Defendants have no obligation to advance any fees or other expenses to Plaintiffs and alternatively that Defendants are required to return to Plaintiffs any and all expenses advanced to them by Plaintiffs;

E.      Awarding reasonable attorneys' fees and costs of the suit incurred herein; *and*

F.      Such other and further relief, whether in law or at equity, as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable thereby.


Dated:  March 25, 2019                    Respectfully submitted,

                                          GORDON & REES LLP


                              By:  *s/Douglas E. Motzenbecker*
                                   Douglas E. Motzenbecker
                                   18 Columbia Turnpike - Suite 220
                                   Florham Park, New Jersey 07932
                                   973-549-2500 (main)
                                   973-549-2514 (direct)
                                   862-432-2678 (mobile)
                                   973-377-1911 (fax)
                                   dmotzenbecker@grsm.com

                                   Herbert Beigel
                                   **Law Offices of Herbert Beigel**
                                   5641 N. Chieftan Trail
                                   Tucson, Arizona 85750
                                   520-825-1995
                                   520-869-5836 (mobile)
                                   520-844-6215 (fax)
                                   hbeigel@me.com
                                   *Pro hac vice* application to be filed

Robert Viducich
**Law Office of Robert R. Viducich**
40 Wall Street - 28th Floor
New York, New York 10005
Tel: (212) 400-7135
rviducich@rrvlaw.com
*Pro hac vice* application to be filed

*Attorneys for Plaintiffs*