## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HERTZ CORPORATION and HERTZ GLOBAL HOLDINGS, INC., | Case No.: 2:19-cv-08927 |
| *Plaintiffs*, | |
| v. | Hon. Esther Salas, U.S.D.J. Hon. Cathy L. Waldor, U.S.M.J. |
| MARK FRISSORA, ~~ELYSE DOUGLAS,~~ and JOHN JEFFREY ZIMMERMAN, | |
| *Defendants*. | Civil Action |

~~FIRST~~

## ~~SECOND~~ AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs The Hertz Corporation ("Hertz Corp.") and Hertz Global Holdings, Inc. ("Hertz Holdings," and together with Hertz Corp., the "Company," "Hertz," or "Plaintiffs"), by and through their undersigned counsel of record, hereby sue Defendants Mark Frissora ("Frissora~~"), Elyse Douglas ("Douglas"),~~") and John Jeffrey Zimmerman ("Zimmerman"), and allege as follows.

### NATURE OF THE ACTION

1.      Hertz brings this action, pursuant to Hertz's 2010 and 2014 Compensation Recovery Policies (the "ClawBack Policies"), to recover, *inter alia*, approximately $~~70~~56 million in incentive compensation paid to Defendants as a result of inappropriately inflated

1

net pre-tax income publicly reported for its 2011, 2012, and 2013 fiscal years, causing the necessity of a restatement of the financial statements for those years (the "Restatement" or "Restatement Period"), as well as certain other damages suffered.   The Compensation Committees of Hertz's board of directors have made a good-faith determination that the Restatement was triggered by the gross negligence and misconduct of Hertz's senior executive officers, including the Defendants, as well as others not named as defendants in this Complaint, but who nevertheless were significant actors in the unfortunate continuing maelstrom and gross negligence at the senior level, including Elyse Douglas, Scott Sider, and Jatindar Kapur, respectively, the CFO, head of the U.S. Rental Car Division, and Controller of Hertz – that is, the very people entrusted with safeguarding the Company's financial standing  and this.   This lawsuit is triggered by their subsequent Defendants' refusal to honor the terms of the ClawBack Policies, and certain incentive compensation agreements, and return the incentive compensation paid to them.

1.   As indicated above, under the 2010 ClawBack Policy – which was expressly incorporated into various compensation agreements Defendants entered with the Company, as well as expressly incorporated into Hertz's Standards of Business Conduct in 2009,[1] and which policy (and the amended version in 2014) were otherwise well known and agreed to by them – Defendants are now required to forfeit their unjustly received incentive pay, together with severance that was paid to Defendants, having specifically promised to do so in the event that

---

[1] As indicated in Hertz's November 16, 2009 S.E.C. Form 8-K filing – which was signed by Douglas – Hertz's board approved on November 12, 2009 "an amended and restated Standards of Business Conduct (the "Code") applicable to its employees, including its Chief Executive Officer, Chief Financial Officer and Controller," which was "revised to include a "claw back" policy for all annual incentive, long-term incentive, equity-based awards and other performance-based compensation arrangements, effective January 1, 2010 . . ." and "[t]he full text of the revised Code ha[d] been posted on the "Investor Relations – Corporate Governance – Overview" portion of the Company's website at www.hertz.com." More specifically, the incorporated ClawBack policy provisions appeared in the revised Standards of Business Conduct's section "N," which was titled "Compensation Recovery Policy."

Hertz's Compensation Committees made a formal, good-faith determination that Defendants' mismanagement caused or contributed to the Restatement of the financial results upon which those payments were based. The Compensation Committees made such a determination on February 11, 2019. The ClawBack Policies expressly state that such a determination is "final, conclusive and binding on all persons . . . and employees[.]"

2.      ." In addition, Hertz also seeks (i) damages of more than $200 million suffered because of the inappropriately inflated net pre-tax income from its 2011, 2012, and 2013 fiscal years, the proximate result of the Defendants' wrongful conduct, and the direct, natural and otherwise foreseeable consequence of which was a lengthy and costly investigation by the Securities Exchange Commission ("SEC"), additional significant fees paid to Hertz's accountants, defense of class and derivative suits by shareholders, and substantial damage to Hertz's business, and (ii) damages resulting from Frissora's and Zimmerman's breaches of their respective separation agreements with the Company.

**SUMMARY OF DEFENDANTS' WRONGFUL CONDUCT:**
**THE BASIS FOR THE COMPENSATION COMMITTEE'S**
**GOOD FAITH, AND BINDING, DETERMINATION**

3.      As concerns Hertz's claims pursuant to its ClawBack Policies, the allegations of Defendants' gross negligence and other misconduct, as set forth in this Complaint, reflect, and present the context underlying, the good-faith findings and binding determination of Hertz's duly established and authorized Compensation Committees, which were acting in the best interests of the Company and its shareholders and pursuant to Hertz's contractual rights under the ClawBack Policies.

4.      Defendants' gross negligence and other misconduct manifested itself in "an inconsistent and inappropriate tone at the top," as Hertz disclosed to its shareholders in the

Restatement. In particular, Defendant Frissora, Hertz's Chief Executive Officer ("CEO"), during fiscal years 2011, 2012, and 2013, displayed a management style and temperament that created a pressurized operating environment at the company, where there was an inappropriate emphasis on meeting internal budgets, business plans, and current estimates, which resulted in an environment which the Compensation Committees has determined led to inappropriate accounting decisions and the failure to disclose information critical to an effective review of Hertz's finances.

5.      Upon learning that Hertz might miss a financial target, Frissora would demand mandatory team-wide calls and continuous weekend meetings, and would repeatedly berate subordinates who did not come up with a sufficient number of "paradigm-busting" accounting strategies to fill the gaps between Hertz's actual and expected performance, accusing them of not being team players if they would not play his game. Defendants Douglas and Zimmerman— — Frissora's right-hand subordinates who were entrusted with effectuating his orders— — failed to stop, effectively counterbalance, or otherwise offset or report to Hertz's board of directors (herein, the "Board") Frissora's inappropriately forceful tone, in breach of their duties owed to Hertz.

6.      Defendants' wrongful "tone at the top" was a form of misconduct and gross negligence because it exacerbated various risk factors, among which were:

        a.      Defendants collectively employed or otherwise acquiesced in aggressive accounting to meet growth targets at a time when Hertz did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and training commensurate with its financial reporting requirements to ensure proper selection and application of Generally Accepted Accounting Principles ("GAAP").

b.      Several major corporate endeavors were initiated by Frissora and supported by the other Defendants, including (i) Hertz's complex integration with Dollar Thrifty Automotive Group Inc. ("Dollar Thrifty"), a large competitor Hertz acquired in 2012, and its related divestiture of one of its subsidiaries; and (ii) Hertz's and Dollar Thrifty's ill-timed respective relocations from their prior headquarters to a new consolidated headquarters in Lee County, Florida, driven by Frissora, which resulted in the departure of *more than half* of Hertz's corporate office personnel. Each of these major transitions further strained Hertz's internal controls. Frissora, with the support of the other Defendants, nonetheless placed enormous pressure on Hertz's already-taxed internal controls while they were dealing with the impact of these major corporate initiatives. Moreover, Frissora was wrongfully fixated on maximizing short-term profits at the expense of long-term objectives, the result of which he knew would boost his incentive compensation but, among other things, thereby degrading Hertz's fleet and damaging customer relationships.

c.      The above-described corporate endeavors were implemented by Frissora through a distracting mix of multiple, conflicting business initiatives, and a system of colliding reporting structures, reporting lines, and decisional authority responsibilities. When combined with the pressurized operating environment set from the top down by Frissora, these created the climate in which multiple financial errors predictably occurred.

d.      Defendants significantly compromised the Company's long-term security by pushing a counterproductive aggressive agenda, doing so despite knowing full well that Hertz was in a difficult and taxing period of corporate upheaval that strained the Company's already- inadequate internal controls.

### THE PARTIES

7.      Hertz Global Holdings, Inc. is a Delaware corporation with its principal place of business at 8501 Williams Road, Estero, Florida. Prior to 2014, Hertz Holdings' nerve center  and principal place of business was in Park Ridge, New Jersey. Hertz Holdings is the parent corporation of Plaintiff Hertz Corporation.

8.      The Hertz Corporation is a Delaware corporation with its principal place of business in 8501 Williams Road, Estero, Florida. Hertz Corp. retains an office in New Jersey and is a subsidiary of Hertz Holdings and operates the Hertz, Dollar, Thrifty, and Firefly vehicle rental brands, along with approximately 11,500 corporate and franchisee locations throughout North America, Central America, South America, Europe, Africa, the Middle East, Asia, Australia, and New Zealand.

9.      Mark Frissora is an individual who, upon information and belief, is domiciled in  a state other than Florida or Delaware. From July 2006 until his resignation on September 8, 2014, Frissora served as Board Chairman and CEO of Hertz Corp. and Hertz Holdings.

2.      ~~Elyse Douglas is an individual who, upon information and belief, is domiciled in a state other than Florida or Delaware.  Douglas was employed by Hertz from July 2006 until December 2013.  She served as Senior Vice President and Treasurer from July 2006 to September 2007, and as Executive Vice President and CFO from October 2007 until her resignation on September 23, 2013.  Douglas continued to work for Hertz after her resignation, finally departing the Company on December 31, 2013.~~

10.     John Jeffrey Zimmerman is an individual who, upon information and belief, is domiciled in a state other than Florida or Delaware. Zimmerman served as Executive Vice President, General Counsel, and Secretary of Hertz from December 2007 until his resignation

in December 2014.

<u>**JURISDICTION AND VENUE**</u>

11.     This Court has subject-matter jurisdiction over the causes of action stated herein pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and Plaintiffs seek to recover damages in excess of $75,000.   Plaintiffs are Delaware corporations with their principal places of business in the state of Florida; Defendants are domiciled in states other than Florida or Delaware.

12.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this District, wherein Plaintiffs were headquartered during the great majority of the alleged wrongdoing and where Plaintiffs continue to maintain a key corporate office.

13.     This Court has personal jurisdiction over each of the Defendants pursuant to Federal Rule of Civil Procedure 4(k) and New Jersey's long arm statute. Defendants carried on business in the state of New Jersey for Hertz and engaged in gross negligence and other misconduct in New Jersey, as alleged herein.

<u>**ALLEGATIONS**</u>

**I.     <u>BACKGROUND</u>**

14.     Hertz and its predecessor corporations have been in the truck and car rental and leasing business since 1918, and in the equipment rental business since 1965.

15.     At all relevant times, the Defendants, agreed to comply with, and each was otherwise subject to, Hertz's Standards of Business Conduct (the "Standards~~"),~~") which ~~not only expressly incorporated Hertz's 2010 ClawBack Policy, but~~ outlines the Company's general standards for the ethical and lawful conduct of its business, and imposes on each employee an

7

individual obligation and responsibility to comply with both the intent and the literal terms of the policy.  Besides requiring that employees not violate the law or the Company's ethical standards, the Standards also requires, among other things, that an employee report when another employee has violated the law or the Company's ethical standards, and required employees like Defendants to provide each year a certification concerning compliance and to disclose any potential violations of law.

16.     The Standards have been revised from time to time between 2009 and 2014, including a revision in November 2011 that (as Hertz disclosed in a November 22, 2011 SEC Form 8-K)  was "intended to simplify the manner in which information is  presented"  but did "not affect any material substantive changes to the policies in the Code," and which user-friendly presentation was continued when the Standards were later revised again in 2012.  In other words, the Standards have always required Defendants (and all other employees) to act ethically and within the law.   Indeed, even the later user-friendly versions that do not contain the level of detail provided in earlier versions note that "[i]n addition to our Code and Hertz's policies and procedures, we all have a duty to uphold the law," and refer to the company's "Policies and Procedures Database" (which includes the ClawBack Policies in effect).  And, as Defendant Frissora emphasized in his message introducing that new, user-friendly version:

> "While we want to win the competitive battles we fight each day, that does not mean winning at any cost. Neither you nor Hertz should ever compromise your integrity in your duties or in any actions taken on behalf of our Company. We will always comply with the laws governing our operations.  We will always treat each other with dignity and respect.  We will always deal fairly with our business partners and customers.  We will always be a good corporate citizen in every area where we operate."

16.17. In July 2010, Hertz began what would become a years-long effort to acquire Dollar Thrifty, one of the larger rental car companies in the United States at the time.  Hertz faced

stiff competition from Avis Rent a Car—one of Hertz's direct competitors in the United States rental car market (along with Enterprise Rent--A--Car)—to acquire Dollar Thrifty.  Dollar Thrifty targeted customers in the mid-market and budget-conscious ends of the rental car market, offering a larger variety of bargain rentals. In an effort to penetrate the bargain rental market, Hertz had previously acquired a subsidiary known as Advantage Rent a Car. However, in December of 2012, after defeating Avis's competing bids and completing its acquisition of Dollar Thrifty, Hertz divested itself of Advantage, which was eventually acquired by Catalyst Capital Group.

17.18.      From July 2010 through the Restatement Period, Hertz was in a period of enormous institutional changes related to the acquisition of Dollar Thrifty, the integration of Hertz's and Dollar Thrifty's operations, the acquisition and divestiture of Advantage, and, later, the relocation of Hertz and Dollar Thrifty to a new consolidated headquarters in Lee County, Florida and the attendant departure of *more than half* of Hertz's corporate personnel (among other things).

18.19.  During the Restatement Period, a majority of Hertz's directors and senior management officials were hired and/or promoted at Frissora's urging.  Defendants Douglas andDefendant Zimmerman werewas no exceptionsexception.

## II.    SUMMARY OF DEFENDANTS' RESPONSIBILITIES AND INCENTIVE COMPENSATION

19.20.   **Mark Frissora:**  Mark Frissora was hired as Hertz's Board Chairman and CEO in July 2006, shortly before Hertz's initial public offering.  Frissora presided over Hertz during a period of rapid expansion and tumultuous upheaval, including in the acquisition of Dollar Thrifty and the relocation of Hertz's headquarters from Park Ridge, New Jersey to Lee County,

Florida.

      a.    As CEO, Frissora was Hertz's highest-ranking executive. In his capacity as CEO, Frissora was primarily responsible for managing Hertz's day-to-day operations, and guided the Company's major decisions, including the acquisition of Dollar Thrifty, the transition to a new accounting system, and the decision in 2013 to relocate Hertz's headquarters to Lee County, Florida. Moreover, Frissora was responsible for setting Hertz's vision and tone, and was the Company's most prominent business figure during the Restatement Period. Thus, it was ultimately his responsibility to ensure Hertz was adequately mitigating its financial risks. And, as CEO, he presented Hertz's financials to the Board.

      b.    As Hertz's senior-most officer, his vision for Hertz during the Restatement Period was implemented on a day-to-day basis through his subordinates, including Defendants Douglas, then the Chief Financial Officer ("CFO"), and Zimmerman, then the General Counsel ("GC"). Frissora took direct and intimidating and/or demeaning steps to instill an aggressively pro-growth culture within Hertz. Many of Frissora's subordinates believed that his aggressive attitude placed tremendous and inappropriate pressure on his subordinates to meet financial targets.

      c.    Frissora was very well compensated for his work as Hertz's CEO. In addition to his base salary (which averaged approximately $1.3 million annually during the Restatement Period), and several valuable perquisites (including the use of company aircraft and cars), Frissora received several forms of incentive-based compensation tied to Hertz's growth and earnings. Frissora's incentive pay included stock awards, option awards, non-equity incentive plan compensation, a well-funded pension, and other forms of valuable annual and deferred compensation.

2021.   All told, Frissora received millions from Hertz in incentive compensation during the Restatement Period and additional compensation upon his resignation, which he expressly agreed to be treated as incentive compensation (under the Company's ClawBack Policy then in effect).

3.   **Elyse Douglas:**  Elyse Douglas was hired as Hertz's Senior Vice President and Treasurer in July 2006, at the same time Frissora was hired as CEO.  She was quickly promoted to CFO in October 2007.

a.   Douglas' responsibilities as CFO included supervising the presentation and reporting of Hertz's financial information to government agencies and shareholders, overseeing Hertz's capital structure and investments, and working with various consultants and other stakeholders to identify areas of growth for the Company.  Moreover, as Hertz's CFO, Douglas presented Hertz's financials to the Board.

b.   Douglas was Frissora's right-hand fellow executive during the Restatement Period.  She was hired at the same time as Frissora, just before Hertz's November 2006 initial public offering, and Frissora quickly promoted her to CFO less than a year later.  She played key roles implementing the major corporate changes Hertz underwent during the Restatement Period, including the Dollar Thrifty merger and the transition to a new accounting system.

c.   Douglas also worked hand-in-hand with Frissora in ensuring the Company met its aggressive targets for growth.  As CFO, she was primarily responsible for, and had direct oversight of, Hertz's financial review processes and ensuring Hertz was adequately mitigating financial risks.  Her reports were also responsible for approving Hertz's accounting changes and methodologies.  Yet, she consistently deferred to Frissora and wrongfully failed to

11

counterbalance the obvious pressure he was putting on subordinates to meet financial targets — even if it meant using questionable accounting methodologies.  Nor did Douglas fulfill her obligation to inform the Audit Committee or the Board of any of that misconduct.

d.    Like Frissora, Douglas received a large base salary, several valuable perquisites, and many forms of incentive-based compensation tied to Hertz's growth and earnings and additional compensation upon resignation.

21.22.  **John Jeffrey Zimmerman:** During the Restatement Period, Zimmerman served as Hertz's Executive Vice President, General Counsel, and Secretary.

a.    As Hertz's General Counsel, Zimmerman was charged with ensuring that Hertz, its officers, and its employees acted lawfully and consistently with their duties and obligations.  Moreover, Zimmerman had the responsibility to ensure that the Company remained compliant with its reporting obligations to various government agencies and to shareholders.; that it did not breach any covenants made to third-parties including outside lenders, and; that the Board and relevant committees would be kept fully informed of all material matters; and that fellow senior executives would comply with the obligations imposed by the Standards.

b.    As General Counsel, Zimmerman was well aware of various governance, accounting and financial weaknesses. For example, he was aware of possible improper payments to Brazilian government officials, but failed to disclose what he knew to the Board.

c.    Moreover, Zimmerman was aware of weaknesses within the finance and accounting organizations, pressures on those organizations, and certain accounting changes or requests for changes. For example, during the January 2013 close, Frissora urged

Zimmerman to conduct a granular review of the legal reserves to help the Company "bridge the gap" for year-end results. Then, in September 2013, Frissora again urged Zimmerman to review legal reserves to help close the quarter, saying he was "interested in taking things to trial where we have a  better than 50-50 shot and reversing the settlement accrual."

          d.     As General Counsel and chief compliance officer, Zimmerman was responsible for ensuring the accuracy and completeness of disclosures to stockholders and the public.

          e.     Zimmerman's compensation reflected the importance of his responsibilities. He received a large base salary, several valuable perquisites, and many forms of incentive-based compensation tied to Hertz's growth and earnings. In addition, Zimmerman received additional compensation when he resigned, which he expressly agreed would be treated as incentive compensation (under the Company's ClawBack Policy then in effect).

III.    ~~OTHER KEY SENIOR EXECUTIVES~~

~~4.    **Scott Sider**: Sider served as Hertz's Group President for Rent-A-Car Americas ("RAC Americas") during the Restatement Period.  RAC Americas refers to the core of Hertz's business model:  the renting of passenger vehicles within the United States.~~

~~5.    As Group President for RAC Americas, Sider was primarily responsible for the day-to-day operations of Hertz's core business — Hertz's passenger rentals within the United States.  As such, he was frequently in direct contact with Frissora.~~

~~6.    **Jatindar Kapur:** Kapur served as Hertz's Senior Vice President of Finance and Corporate Controller during the Restatement Period.~~

~~7.    Kapur's responsibilities as Hertz's Corporate Controller and V.P. for Finance included directly supervising (alongside Defendant Douglas) Hertz's financials, the Company's~~

~~"closing" of various accounting periods—in which the numbers are finalized before financial reports are completed—and overseeing Hertz's efforts to resolve and document accounting issues, financial risks, and other potential problems.~~

## IV. DEFENDANTS' GROSS NEGLIGENCE AND MISCONDUCT UNDERLYING THE COMPENSATION COMMITTEE'S GOOD FAITH DETERMINATION AND CLAWBACK DEMANDS

23. Pursuant to the ClawBack Policies, Hertz's Compensation Committees made a good-faith determination that certain misconduct and gross negligence of Defendants caused or contributed to the Restatement of the financial results upon which certain of their incentive compensation payments were based – which determination was final, conclusive and binding on each of the Defendants under the express terms of those policies, which Defendants' had agreed to as Hertz employees. Although not necessary to sufficiently plead Hertz's breach of contract claims that are based on the ClawBack Policies, the allegations which follow below illustrate certain of the misconduct of the Defendants which underlay, and otherwise provide context for, the Compensation Committee's good faith (and binding) determination that such compensation be returned to the Company, per its ClawBack Policies and other agreements with them. In addition, the misconduct described in those allegations also comprise Defendants' breaches of Hertz's Standards, which demands from its employees, *inter alia*, integrity and ethical and lawful conduct of its business, including honest, accurate and fair books, records and accounting and the reporting and disclosure of misconduct.

### A. ~~A.  Defendants Materially Weaken~~ Hertz's Weak Internal Controls

24. Hertz's size and complexity—both before and after the Dollar Thrifty acquisition meant that the Company needed to have strong internal controls to prevent mismanagement and faulty accounting practices from slipping through the cracks.

14

25.   However, during the Restatement Period, Hertz suffered from numerous material deficiencies in internal controls that Defendants were aware of yet failed to correct. These deficiencies predictably made it inevitable that Frissora's unchallenged aggressive push  for profits would result in financial misstatements. These deficiencies included, but are not limited to: (a) inappropriate tone at the top; (b) insufficient personnel with a lack of training, knowledge, and experience commensurate with financial reporting requirements; (c) lack of organizational structure; (d) ineffectively designed controls over non-fleet procurement process; (e) ineffectively designed controls over accounting estimates; (f) ineffectively designed controls  over the review, approval, and documentation of manual journal entries; (g) ineffective controls over GAAP policies and procedures; (h) ineffective controls in response to the risks of material misstatement; (i) insufficient controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments; (j) ineffective process for internal communication between accounting and other departments within the business; and (k) ineffective internal audit function.

26.   More specifically, ~~Defendant~~Elyse Douglas, Hertz's CFO, had minimal experience as the Company's Treasurer before her promotion to CFO. Her subordinates similarly lacked  experience in GAAP, including Hertz's head of internal finance services.

27.   ~~Frissora was also aware of these deficiencies.  He not only hired~~ Defendants (~~and promoted~~ Douglas ~~but~~) received frequent Human Resources summaries ~~as CEO,~~ which informed ~~him~~ about "the general environment in Finance," where employees were "overworked," suffered from "a lack of communication," and were beset by other significant concerns.

28.   These personnel risk factors were exacerbated by two other powerful factors:

(a) the departure of a substantial number of personnel when Hertz began its ill-timed relocation of its operations in Lee County, Florida (reducing the size of its Park Ridge, New Jersey offices); and (b) the early retirement of a substantial number of senior personnel in 2011 and 2012 under Hertz's early retirement program.

29.     Ultimately, throughout the Restatement Period, during which Defendants sought the review of an enormous number of major accounting changes, Hertz lacked appropriately trained accounting review personnel throughout its corporate structure. This deficiency was the result of Defendants' effort to aggressively cut costs, which resulted in reduced head-count for their financial review teams and contributed to Hertz's inability to hire appropriately qualified, GAAP-trained accounting personnel.

30.     Moreover, Hertz's financial review team was under substantial strain during the Restatement Period, during which Hertz underwent a series of corporate changes including the acquisition of, and integration with, Dollar Thrifty, the acquisition and divestiture of Advantage, the dislocation and employee turnover caused by the Company's relocation to Lee County, Florida beginning in May 2013, and the expansion of Hertz's retail car sales outlets.

31.     The deficiencies associated with Hertz's under-qualified and overtaxed review team were compounded by Hertz's lack of a centralized accounting system during the Restatement Period, a substantial number of critical accounting decisions were left to the subjective judgments of accounting personnel, exacerbating existing control deficiencies.

32.     Rather than delay the integration of the new accounting system, or otherwise ensure that the existing control deficiencies were not so exacerbated, Defendants chose to push for  major changes in its accounting processes at precisely the same time Hertz underwent the major, complicated corporate changes discussed above. Doing so further strained Hertz's

internal controls.

33.     On top of the foregoing control deficiencies, Hertz suffered throughout the Restatement Period from a lack of overall clarity regarding which departments were actually responsible for accounting changes, judgments, and policies. Hertz had Finance Shared Services personnel in Oklahoma City, Divisional and Fleet Accounting personnel in different countries and business units, accountants working in the Corporate Controller office, and finance business partners. There were frequent issues with authority and jurisdiction between these groups, which Defendants failed to correct. Chain-of-command issues contributed to several of the accounting errors that lead to the Restatement, as several critical changes were not appropriately vetted. Moreover, it enabled various stakeholders, including Defendants, to point fingers at others rather than accept responsibility for errors.

34.     Moreover, ~~Defendant~~Defendants were aware of Douglas' poor managerial style but failed to remediate these overlapping command hierarchies~~.~~, or report these problems to the Board. As Frissora ~~learned from Human Resources managers within Hertz and then~~ wrote in an e-mail~~that~~:

> "[t]he communication within [Hertz's finance department] is not good," because "several different directives are relayed by Elyse's lieutenants after a staff meeting . . . and those directives are often diametrically opposed. This leads to frustration as the staff is  forced to do multiple tasks knowing most of them are in vain. Requests for clarification from the staff to her direct reports are often unanswered and there is a **fear to go to Elyse directly** because of the potential ramifications of going over a direct supervisor's head. **In fact, most feel they are always on the 'firing line.'  The culture is generally fear based.  The staff  does not like being in meetings with Elyse or their direct supervisors as the meetings tend to lead to fits of yelling**." [Emphasis added.]

35.     As a result of Defendants' poor management, Hertz's financial review personnel

17

were "bordering on burn out (if not already there)" because "[c]ommunication [was] not good," and "[m]orale [was] not good." Indeed, Hertz's Human Resources personnel noted that the financial review teams "fe[lt] the current work processes [were] flawed," and that they were "penalized for asking questions." Defendants plowed forward with their aggressive cost-cutting agenda despite knowing the extent of these risk factors.

36. Ultimately, Defendants, the Company'stogether with other senior most officers executives, were responsible for streamlining its hierarchy and ensuring the appropriate review of accounting changes. Their failure to do so constituted gross negligence and misconduct contributed to the need for the Restatement.

37. All told, Defendants caused, and contributed to the worsening of, each of the foregoing deficiencies by and through their gross negligence and misconduct.

38. The aggressive tone and the deficiencies described above "reached a boiling point" during the Restatement Period, in the words of one Hertz employee, who noted that there was tremendous "pressure" being applied (particularly by Frissora) to improve numbers and that it had placed incredible strain on his review team. Thus, Frissora's decision, acquiesced in by the other Defendants, to keep pushing for aggressive cost-cutting measures—despite their direct contributions to the foregoing deficiencies—crossed the line into gross negligence and misconduct during the Restatement Period.

**B. B. Accounting Wrongdoing Caused or Contributed to by Defendants[2]**
**1. Tone at the Top**

8. In significant part, the accounting errors and need for the Restatement were due to the inappropriate "tone at the top," which misconduct precipitated Defendants' grossly

---

[2] Bold font and underscoring has been added to portions of quoted statements appearing in this section.

negligent mismanagement of the Company. The following examples are illustrative of the inappropriate "tone at the top" set by Frissora, which Douglas and Zimmerman fueled and/or failed to counterbalance or otherwise challenge.

a.   Frissora would, on a consistent basis, aggressively seek "opportunities" to increase earnings and promote eleventh hour (near the close of a financial reporting period) efforts to "close the gap."

b.

39.   During the Restatement Period, Hertz was subject to Frissora's iron fist and Zimmerman's grossly negligent failure by turning a blind eye to what was happening at Hertz, kowtowing to Frissora's pressure to increase the appearance of profits, which, of course, would substantially benefit him, Zimmerman, and other senior executives.  The following paragraphs describe some of the conduct that reflects the gross negligence of Defendants and others.  Of particular significance is that, although Zimmerman was not a party to every communication, in his position as General Counsel he was, and should have been, well aware of the what was happening and his responsibility to mitigate and report to the Board so it could take appropriate action to avoid what inevitably happened.

40.   On November 13, 2012, at the close of the 2012 fiscal year, Frissora emailed Douglas and Controller Jatindar Kapur (along with two others  who played important roles in Hertz's internal audit processes, Hertz's Vice President of Process Improvement and its Senior Vice President North America RAC Operations) asking them to  "begin a formal process of reviewing every reserve account we have … and who is responsible  for the methodology and estimating of the reserve."  Frissora asked for "detailed and granular  reviews starting asap so we have time before [sic] the end of the year."  Underscoring the time-sensitive nature of Frissora's request, he also asked for Douglas and Kapur's "respective schedules on the meetings," and said

19

he needed "real leadership and discipline here" to fix issues with the closing figures for Hertz's 2012 fiscal year.

41.   Later that month, the issues with the 2012 fiscal year financials crystalized.  In December 2012, Hertz was projecting a multi-million-dollar shortfall below its expected earnings in several key areas.  In an email from Kapur to Frissora and Douglas, he noted that Hertz's year-end financial results had "deteriorated" and that "the entire  team is focused on brainstorming an[d] executing profit enhancing ideas."

42. In response to Hertz's projected shortfall, Frissora commented "What a disaster." Kapur agreed that the figures were "terrible" and that Hertz had "a long way to go to get to the analyst average," underscoring the gap that would have to be closed to meet expected financial results for the 2012 fiscal year.

43.    However, because it was the end of the fiscal year, the only way for Hertz to travel the "long way to go to get to the analyst average" would be through last-minute accounting gimmicks, executed in a short time frame by Hertz's undertrained, undermanned, and over-taxed financial review teams.

44.   Early in the morning on January 5, 2013, as Defendants scrambled to reach expected financial targets for the 2012 fiscal year, Kapur emailed Frissora and Douglas, saying: "We have an issue with the close [of the 2012 financials] and need to keep it open," because Hertz was "20 million off' of its financial targets."  Kapur then set forth a "path to get there" by identifying four accounts where accounting changes would result in a total of $20.3 million in additional revenue and cost savings.  However, to change those accounts, Hertz would "need to keep the close open" through the following week, delaying the finalizing of its 2012 financials.

45.  Kapur added that "we [*i.e.* Frissora, Douglas, and Kapur] should continue to push hard on the close in the divisions and see if we can target another 7-8 million in the divisions pretax," and that he was "having calls with the divisions th[at] morning" in an effort to find additional last-minute savings.

46.  Later that morning, Douglas emailed a group of division heads saying "Mark [Frissora] requested a mandatory 10am call this morning to discuss the December [financial] results," and circulated a dial-in number.

47.  The next day, after Frissora's mandatory call, Frissora was disappointed few of his subordinates had come up with aggressive cost-saving proposals, stating:  "I have heard from only two of you on good news opportunities and action plans … that is unacceptable … maybe my message was unclear … (Not really) … you should be working this weekend on brainstorming meetings and actions that could close this gap … step up please … in the future based on what I am experience on this all hands on deck initiative maybe should we have all day meetings on the weekends … or maybe you are not communicating to me …."  He added that  "regardless, I want to know … what you have done incrementally this weekend … this is an emergency and you all need to step up NOW! … emails to me now on what you have done and are going to do today please."

48.  In response to Frissora's strongly worded email, Zimmerman said the legal team had spent time with Douglas and Kapur, and that "all legal contingency reserves ha[d] been thoroughly reviewed," but "no changes that permit any needed adjustments" for cost savings were found.

49.  In response, Frissora replied "**you don't get it … you really don't Jeff** … you need to personally lead another granular review without Jatindar and Elyse to depend on … and

challenge your team at all levels … and **think of out of the box ideas that come from a sense of urgency which spawns from passion to give more to the company cause**."

50.   Throughout the process, Frissora's over-aggressive, domineering management style was on full display.  Indeed, just after Hertz filed its fiscal year 2012 Form 10-K, Frissora tore into Douglas for inadequately managing Kapur and others' approach to monthly and quarterly estimates, stating: "**Why am I doing this … you need to either turn on your brain or you cannot be the CFO** … just so you know I am going to be very direct to you this year on feedback … I have been very gentle on you the last two years and it has maybe lead to a false sense of how well you are doing." Not only was this a message to Douglas but to other senior executives, including Zimmerman, that if he challenged Frissora, his employment would also be in jeopardy.

51.   **Aggressive Tone During The 2013 Fiscal Year:**   In April 2013, as Hertz approached the time to file its first-quarter financial results for the 2013 fiscal year, Frissora was again concerned that Hertz's earnings would again fall below expectations.

52.   On April 2, 2013, Hertz employees again began looking at a number of areas for last-minute cost cutting to improve their quarterly earnings.  One such change—later identified in the Restatement—was to ~~extend~~look into whether the amortization period could be extended on Hertz's ~~vehicles.~~ vehicle fleet from 16 months to 18 months.  Such a change would permit Hertz to spread out various costs of owning the vehicles in its fleet, reducing monthly expenses by dividing the total amount of depreciation over a longer period of time.  In particular, ~~Defendants' subordinates~~Hertz employees zeroed ~~in~~ on increasing the amortization period for vehicle registration and title fees as a way of quickly cutting costs.

22

c.   One challenge53.   The problem with establishing amortization periodschanging the depreciation rate for vehicle registration and licensetitle fees is that thesuch a change in methodology would need to be based on documentable reasoning  under GAAP, such as the average period can be of time the titles and registrations lasted.  However, that period is different in each U.S. state or municipality, and it was difficult to obtain, and Hertz lacked detailed information on a car-by-car or jurisdictionstate-by-jurisdictionstate basis for vehicle licensestitles and registrations.  Hertz therefore used estimates for amortization periodsSo, the decision was made to use an  average depreciation period.  At the beginning of the Restatement Period, the amortizationdepreciation period was 16 months.

d.   54.   In April 2013, Hertz employees considered extending this period to 18 or 17 months.  An extension to 18 months would result in savings of roughly $1.5 million for the quarter, whereas an extension  to 17 months would result in roughly $786,000 in savings.

55.   However, as with the initial 16-month depreciation period, Hertz's accounting personnel were unable to obtain data to develop sufficient documentation of thelacked an actual, documentable basis for extending the depreciation period on vehicle licensetitle and registration fees, rendering this cost-saving measure suspect from an accounting  standpoint.

e56.   Nonetheless, the vehicle license and registrationon April 8, 2013, the depreciation period extension was sent directly  to Douglas as a way to "bridge" Hertz's financial gap..  Hertz ultimately extended the amortizationdepreciation period to 18 months, cutting $1.5 million in costs from their books.

f.   Frissora initiated a related change, to wit, retaining57.  Shortly after this potential cost-saving measure was identified,  Hertz's Vice President of Process Improvement   emailed a large group of high-level Hertz Employees, including

Douglas and Kapur, on April 8, 2013 with an update on the gap between Hertz's actual and expected earnings.  He noted  that "we have a gap of $53.4 million to go to 'green'" because "we have a gap of $34.4 million to hit the target and that includes a place holder of $19M that US RAC has in their numbers." He then said "we need the other domains to help make up some of this gap to ensure we hit the full-year number," particularly because one of Hertz's divisions, Fleet, was $24.2 million  in the red on its own.  To fill the gap, Defendants and their subordinates began attacking a  "risk/opportunities file" to determine where costs could be cut at the last minute.

58.  Eventually, Frissora stepped in on April 22, 2013, and an email was sent by Hertz's Vice President Fleet in the Americas, imploring division leaders to hit their benchmarks, and seeking "creative, out of the box ideas" to help close the gap,  particularly with regard to depreciation costs.

59. Frissora later responded to that vice president the morning of April 24, just two days later, hastily seeking an answer on what happened to fleet depreciation costs, which caused them to balloon so much.  Despite only two days prior emailing for "creative, out of the box ideas,"  Frissora demanded an immediate response:  "**Need this NOW … I am not waiting anymore … send me what you have**."

60.  Later that morning, that vice president responded to Frissora's demand, emailing Frissora, Sider, Douglas, and Kapur with bad news.  He had looked into fleet  depreciation costs, and had determined that expected costs were much lower than actual costs— to the tune of $39 million—and that Hertz's initial expectations on costs were set too low.

61.  Frissora responded:  **"This is a disaster … better yet a cluster               "** (expletive omitted in original).

62.  Frissora then asked "How long have you or anyone … known about the errors and who made them."  The Vice President Fleet in the Americas noted that the errors were due to improperly low expectations, the result of "an early miscommunication error between the person that prepped the initial spreadsheet … and other members of our Finance group." However, he added that certain of the expectation concerns—concerning Dollar Thrifty's integrated fleet—were brought to Kapur's and Sider's attention.  Ultimately, he noted that the erroneous expectations "could have been picked up very easily" had the accounting and executive team looked at actual, rather than expected, data

63.  Later, in late April 2013, Defendants began considering other short-term cost-cutting measures.  One of those measures was to retain existing vehicles for longer periods of time.  This myopic change would result in short-term savings—for example, by extending the planned holding period for theas Hertz would not have to buy as many new vehicles, losses could be deferred in what was a declining market.  Moreover, the strategy came with adverse long-term costs, includingdecreased monthly depreciation costs.  But it would come with several long-term costs.  *First*, Hertz would have fewer revenues from selling used cars from its vehicle fleet; Hertz could not sell the vehicles it retained which would also cause higher maintenance costs.  *Second*, the change would come at a reputational cost because Hertz's customers expected cars to be newer, lower-mileage vehicles.  The decision to shift a greater percentage of Hertz's fleet into a longer planned holding periodthe 30 month-old range would result in not only lower depreciation rates, but also lower customer satisfaction.  However, Defendants sought and approved the changethese myopic changes in planned holding periods for partsspite of the fleet despite these risks.

g.   These and other 64.  Then, in early May 2013, Hertz's monthly financial data came in and showed yet another significant gap between actual and accounting changes were promoted and approved by Douglas with expected earnings.  In Douglas' words, "the active consent and encouragementmonth of Frissora and April results are worse than anticipated."  Part of the grossly negligent failure of gap was, unsurprisingly, due to a significant decrease in revenues from car sales and residual values.

65.  To bridge this latest financial gap, Douglas implored subordinates, including Zimmerman to inform, to put "**all hands on deck … to overcome these risks**."

66.  One such change would be to once again change vehicle title and registration fee depreciation rates.  On May 3, 2013, a subordinate emailed Douglas noting that additional cost savings could be obtained by extending the depreciation period for Dollar Thrifty's vehicles.  In the name of consistency, Hertz extended the depreciation for Dollar Thrifty's vehicles from 12 months to 18 months, matching Hertz's earlier extension for vehicles in Hertz's fleet, which increased the amortization period for registration and license fees.

67.  By June 2013, however, the gap continued to worsen.  Frissora became worried Hertz might miss its share value "guidance" and analyst expectations for the Company's per-share value—for the first time in his tenure as CEO.  If Hertz fell below its guidance, it would be a major indication that the Company was underperforming.

68.  To close the gap, a list of possible cost-cutting opportunities was sent by Hertz's Vice President of Process Improvement to Douglas on June 19, 2013.  The list included an item—subrogation changes— which was ultimately part of the Restatement.  In addition to areas for possible cost savings, he listed expected values for the cost savings.

69.  Later that day, , Hertz's Vice President Financial Shared Services, who worked with  Hertz's accounting team in  Oklahoma City (Financial Shared Services), emailed the company's Vice President of Process Improvement, stating:  "between you and me, **I am very concerned with the numbers that are being thrown out below**.  None of the estimates given below on my areas [for review and approval] came from me or my team.  **Honestly they are extremely unlikely and some border on recklessness.  Now I get to report  against these numbers and I know that I will be viewed negatively for not meeting the tasks  which were unrealistic and from god knows who in the first place**.  That will not even be considered.  **The [Financial Shared Services] team is doing everything possible to find  opportunities but unless a miracle happens we will not come close to these task numbers**."

70.  Hertz's Vice President Financial Shared Services later told the company's Vice President of Process Improvement the next day to expect a lot of "hotline calls in this month"—*i.e.* calls reporting improper accounting practices to Hertz's internal hotline.  He stated:  **"There is a lot of noise from the accounting team on the pressure that is  being applied by the business to improve numbers without the supporting data being there.  This has now reached a boiling point."**  He was not the only one in this position.[3]

---

[3] Hertz's Senior Vice President Revenue Management and Pricing later wrote to Zimmerman, describing on July 25, 2014 an incident where Frissora threatened his  job "because [he] was just expressing concern that we have risk on an embedded [financial] forecast."  Frissora, in a large meeting of Hertz employees, had responded to that officer's  concerns by stating "I can do a post audit of your performance … and I can reverse engineer  what happened, I am very good at that."  That Senior Vice President told Zimmerman "[n]ot only did I feel  humiliated, but **I also feel threatened of my job if I ever speak up again**."  He later added "I  do believe that [Frissora] is unprofessional with his passive aggressive comments, plausible  deniability, and scare tactics …. **I feel intimidated when I provide honest feedback**."

27

71.  By August 2013, it became increasingly clear Hertz's earnings would fall below their analyst guidance.  On August 16, 2013, a weekly financial report indicated Hertz would miss its third-quarter profit benchmark by more than $23 million.

72.  In response, Frissora sent an email to several subordinates, including Douglas, on August 17, 2013, once again asking for "out of the box thinking" on how the Company could once again cut costs, saying he had "seen lots of tax strategies which … can change models, reserves and forecasts in the near term."  He implored his team to engage in "**paradigm busting thinking**," and that there was a "high sense of urgency."  He finished his email by adding "**HAIR ON FIRE!!!!!**"

73.  Later, on August 26, 2013, Frissora emailed Hertz's Vice President of Process Improvement asking how far Hertz was from its guidance and telling him "we need to drive brainstorming every single day" until Hertz closed the gap between actual and expected financial figures.  That vice president followed up, noting the gap was in excess of $24 million.  He also provided a list of potential cost-saving opportunities to bridge the gap (along with expected dollar figures for savings, as he had in June).

74.  Then, on September 12, 2013, Frissora sent an early-morning email to several subordinates, including Douglas, Kapur, Sider, and Zimmerman with the subject line "URGENT."  Frissora stated:  "I want to be clear … you should be spending **all of your time for the remainder of the month** brainstorming with your teams on ways to close the quarter stronger.  Incremental activity is required for us to close the gap," including "pressuring the organization to perform at higher levels."

75.  Underscoring Frissora's tone, he noted that he had "checked on everyone's schedules" and was "alarmed at how many people are not in the office and focused on driving

28

improvement to the forecast." He implored his subordinates to "clear [their] schedules and focus only on the quarter," and that this was "**a directive and it is non negotiable from me to you**." He then asked employees to send him their schedules "so I know what you are doing every day through the first week of October," when the figures were due. He asked his team to send him cost-cutting proposals as soon as possible.

76. Later that day, Zimmerman emailed Frissora, informing him that he had checked with his legal team and determined that there were no costs to cut with regard to legal reserves maintained for various sources of possible liability. After reviewing with his team and Kapur's, Zimmerman determined "[w]e do not have a basis for adjusting these reserves downward." Frissora responded that he would be willing to engage in more aggressive litigation postures in certain ongoing litigations if it meant reducing the required reserves for those cases, and that Zimmerman needed to think "outside the box" and find additional savings by "being more aggressive."

77. However, by the end of September, it became clear that no matter how many costs were cut, and regardless of Frissora's aggression, Hertz would fall below its analyst guidance for the first time in his tenure as CEO. He emailed the Board and take correctiveof Directors on September 25, 2013, letting them know that Hertz would have to lower its guidance for the remainder of 2013—*i.e.*, lowering expectations for the Company's earnings in light of underperformance. Hertz ultimately reduced its guidance from $1.78-$1.88 per share to $1.68-$1.78 per share.

78. Even after informing the Board Hertz would fall short of its financial benchmarks, Frissora continued his aggressive push for cost-cutting by reducing required reserve accounts by emailing Hertz's interim CFO on October 8, 2013. Critically, he was *just beginning* his

role as interim CFO after Douglas announced her departure on September 23, 2013. Frissora stated "[y]**our biggest value added is finding methodology discrepancies to book income**." He later added "[y]ou need to be there and be involved … your brain need [sic] to be engaged asap on reserve methodology." After his right-hand woman left the Company, Frissora took immediate action—— to ensure her replacement would be equally as pliable in implementing his agenda of u b e r - aggressive and myopic cost cutting.

—— 2. 79. **Frissora's Tone In His Final Months As CEO:** On July 10, 2014, just two months before Frissora tendered his resignation, his improper, combative tone remained on full display. After receiving a daily report from Hertz's Director of Revenue Forecasting that showed decreased revenues, Frissora responded the next day to a group of subordinates, including Sider, saying "**This is worse than not good. You four should stop everything that you are doing and meet until you figure out what happened**" the prior two months. "This is not an industry issue it is a performance issue."

80. On July 24, 2014, Frissora reviewed a financial report showing declining numbers. He wrote: "**Looks like we should plan for failure**." And the next day he again commented: "Just want to make sure you six are aware of how bad these numbers are and that you and your teams have submitted … zero opportunities against these numbers. That these numbers represent all of your opportunities against known risks and there is no upside you can develop that could offset this current roll up. This is what I will tell the board on Monday unless you tell me otherwise. I need a response **from each of you to me today. I must say I find this unbelievable if true that there are no other opportunities you are working but not willing to out to a piece of paper**."

81.   Following Frissora's tirade, Sider e-mailed his subordinates asking for more revenue and cost savings.  On July 25, 2014, two of those subordinates— Hertz's Vice President of Operations, and   the company's Vice President and Controller U.S. RAC, and Sider's top lieutenant—developed a list of opportunities to submit to Frissora.  The "opportunities"  were cost-saving proposals related to vehicle maintenance.

82.  That same day, Hertz's Vice President of Operations e-mailed the company's Senior Vice President Revenue Management and Pricing and its Vice President for Fleet, saying "**Scott [Sider] wants a more aggressive plan for risks/opportunities**," and noted that "there is stretching all around" to reach financial targets.  He then listed a series of potential cost-cutting measures.

83.  In response, that Senior V.P. emailed a group of employees, including Sider and Hertz's new CFO, saying he had "McKinsey [a consulting firm] sit with me yesterday to review the entire [financial] forecast and they also said they did not see any  opportunities and only more risk in the revenue."  He added "**I am NOT signing up for … and  do not agree with the current embedded [revenue] forecast**."  He concluded by noting that he did "**not see any additional opportunity in rate—only risk**."

84.   **Impact Of Frissora's Tone:** Frissora's improper, combative tone placed incredible strain on Hertz's already-taxed review team "to improve numbers without the supporting data being there."  Additional emails reveal the combined impact of Frissora's pressurized operating environment  and the enormous institutional strain on Hertz's employees – a "pressured corporate environment" noted by the SEC in a cease-and-desist order it imposed on Hertz (as noted below).

85.   For example, on July 26, 2014, Hertz's Vice President for Fleet e-mailed Defendant Zimmerman, saying: "I am trying to walk a fine line but it is getting very difficult to maintain.  I asked my family to move to a new state away from where we lived our entire lives, away from all of our relatives.  So I am very sensitive to maintaining a job and a reasonable working relationship with my boss.  So I try to answer the questions in a way that doesn't leave me completely at odds with Mark.  **But what I have seen in particular in the last week is an aggressive push on not only myself but most of my peers who have big item revenue or expense scope, to push the very edge of what we think we could do this year, and then some.  And then once that stretch was in, we get more emails or more calls that he can't believe we can't find more opportunity.  Well, once you've stretched the opportunity two or three times in a week then yeah there becomes a point where you can't add more. But if we don't, then we get emails or comments that he is 'surprised' or 'can't believe' that we aren't working on anything that creates upside potential.   With accompanying statements like 'I guess we should plan for failure' or 'I will tell the board that we can't do anything to improve'.  Insinuating that we aren't trying to help."**

86.   That officer underscored the pressure on his team by saying **"this pressure has mounted exponentially, we are not asked for both sides of the ledger – that is, just show us the upside and anything on risk is portrayed as pessimism or planning for failure.  I think the exercise should be to talk net potential—the balance between risk and opportunity.  But we are intimidated into making lists of only the positive and I am worried about how these items will be portrayed."** He added "I have been on multiple calls this week and at least in that group setting many of my peers are also concerned about the achievability of" Frissora's expectations.

87. As Hertz's General Counsel, Zimmerman was charged with ensuring Hertz, its officers, and its employees acted lawfully and consistently with their fiduciary duties. Moreover, Zimmerman played a direct role ensuring the Company remained compliant with its reporting obligations to various government agencies and to shareholders, and that it did not breach any covenants made to third-parties including outside lenders.

88. Though Zimmerman was frequently criticized by Frissora for failing to embody his growth-at-all-costs culture, Zimmerman ultimately chose to further Frissora's pro-growth agenda, rather than to counter it with an appropriate measure of risk aversion.

89. Indeed, despite receiving a series of complaints from Frissora's subordinates about the highly pressurized culture Frissora had begun instilling, upon information and belief, Zimmerman failed to appropriately raise the issue of Frissora's conduct with him or his superiors on Hertz's Board of Directors.

### C. Defendants' Misconduct and Gross Negligence Necessitated The Restatement Of More Than $200 Million In Hertz's Pre-Tax Income, and Resulted in an SEC Cease-And-Desist Order Finding Violations of Section 17a of the Securities Act of 1933.

90. In or about November 2014, the Company, with the advice of its outside auditors, determined that a restatement of its financials from fiscal years 2011, 2012, and 2013 would be needed.

a. 91. The Restatement, filed with the SEC on July 16, 2015, disclosed that the "**material weaknesses**" in the Company's internal controls—which were caused and/or exacerbated by Defendants' mismanagement—"**resulted in certain instances of inappropriate accounting decisions and inappropriate changes in accounting methodology**," and that, in particular, Hertz had not "design[ed] effective controls over . . . period-end financial reporting processes," such as the "closing adjustments[.]" [Emphasis

added.]

b.   92.   Hertz (with the assistance of its outside auditor) concluded that its "**incorrect accounting was caused by the foregoing control deficiencies**, along with a complex mix of structural and environmental factors," which explicitly included: (i) "**the tone set and pressures imposed** by our former Chief Executive Officer, which . . . may have been a factor influencing one or more employees to record an accounting entry now determined to be improper; (ii) "**the overall historic accounting environment**" within Hertz; and (iii) "the **distraction caused by the multiple, conflicting business initiatives**; challenges related to managing **complex, inefficient legacy systems**; the **lack of a sufficient complement of personnel with an appropriate knowledge, experience, and training with GAAP**; [and] **unclear reporting** structures." [Emphasis added.]**.**

c.   Defendants were responsible not only for Hertz's material control deficiencies but for the inappropriate "tone at the top;" failing to ameliorate Hertz's "accounting environment," which was beset with personnel problems and poor morale; imposing the distraction of "multiple, conflicting business initiatives;" *and* the distraction caused by the enormous corporate upheaval Hertz underwent during the Restatement Period. "As a result of the foregoing . . . [Hertz] restated [its] financial statements for the years ended December 31, 2012 and 2013," and "restated unaudited selected financial data for the year ended December 31, 2011."

9.   93.   All told, the Company's July 16, 2015 Restatement identified **accounting errors,** broken into six broad categories: (a) reserve accounts, (b) fleet adjustments, (c) fixed asset adjustments, (d) Brazil issues, (e) improper accounting reclassifications, and (f) other

adjustments. In the end, "[t]he cumulative impact of the . . . misstatements . . . was approximately a **$349 million in pre-tax income and $231 million reduction in net income**." [Emphasis added.]

] The plethora of accounting errors are described in detail in Hertz's Form 10-K filing for year ended December 31, 2014, an excerpt from which is attached to this Complaint as Exhibit 1.

94.   In addition, after a lengthy investigation, the SEC issued an "Order Instituting Cease-And- Desist Proceedings Pursuant To Section Sa17a Of The Securities Act Of 1933 And Section 21c Of The Securities Exchange Act Of 1934, Making Findings, And  Imposing  A Cease And Desist Order" ("**SEC Order**")**,** which among other things, sets forth findings of the SEC regarding the accounting errors, which caused the necessity of the Restatement. Those accounting errors were caused or contributed to by the gross negligence and misconduct of each of the Defendants. The SEC Order is attached to this Complaint as **Exhibit 2** and incorporated by reference in these allegations.

V.   **DEFENDANTS' RESIGNATIONS AND RELATED AGREEMENTS**

10.   **Defendant Douglas:**  The first of the Defendants to resign was Douglas, whose formal resignation was to be effective on October 1, 2013.  However, Douglas continued her work for the Company until December 31, 2013, including work related to the Company's financial statements for the third and fourth quarters of 2013, and the lead-up to the auditing of its fiscal year 2013 financials.

11.   Upon Douglas' resignation, she and Hertz entered into a Separation Agreement on or about September 23, 2013. The Separation Agreement provided certain severance and related benefits (the "Golden Parachute").

## II.       DEFENDANTS' RESIGNATIONS AND RELATED AGREEMENTS

95.  **Defendant Frissora:** Shortly after the Audit Committee directed its first internal review of Hertz's financials, and as the Company began investigating the mismanagement that would ultimately lead to the Restatement, Frissora tendered his resignation on September 8, 2014. Shortly before his resignation, the SEC informed Hertz in June 2014 that its financials were under investigation.

96.  Upon Frissora's resignation, he and Hertz entered into a Separation Agreement, which provided him with a Golden Parachute.

97.  Frissora's Golden Parachute included, *inter alia*, a single lump-sum payment, the retention of certain incentive-based equity awards, eligibility for 68% of his 2014 bonus, and the continued use of certain perquisites such as car privileges and insurance coverage.

98. **Defendant Zimmerman:** The last of the Defendants to resign their position in the Company was Zimmerman, who resigned on December 5, 2014, shortly after the Audit Committee concluded that a formal restatement would be necessary, and informed Hertz's shareholders of the same.

99.  Upon Zimmerman's resignation, he and Hertz entered into a Separation Agreement, which provided him with a Golden Parachute. Zimmerman's Golden Parachute included, *inter alia*, a series of lump-sum payments the retention of certain incentive-based equity awards, eligibility for 92.9% of his 2014 bonus, and the continued use of certain perquisites such as insurance coverage.

## VI.   DAMAGES

100.  As a result of Defendants' wrongful refusal to return the compensation demanded

of them pursuant to the ClawBack Policies, Hertz has been damaged in the amount of, at a minimum, the amounts demanded and not returned and the time-value loss of such monies paid, as further described below. In addition, as a result of Defendants' prior, underlying misconduct and grossly negligent mismanagement of Hertz, in breach of their contractual obligations under the Company's Standards, the Company predictably suffered four significant additional direct, natural and otherwise foreseeable consequences beyond the stark decrease in the public value of the Company and the impact on Hertz's reputation with customers and the investing public. Those negative consequences were: (1) the impact of several securities class-action lawsuits filed against Hertz; (2) the costs of investigating and defending against multiple shareholder derivative demands, one of which has resulted in ongoing litigation; (3) the effect of four separate federal and state government investigations; and (4) the cost to Hertz to remedy the continuing impact of Defendants' prior misconduct and (grossly negligent) mismanagement, including increased costs of financing and capital.

101.  **Securities Lawsuits:**  On November 20, 2013, the action styled *Ramirez, Jr. v. Hertz Global Holdings, Inc. et al.*—the first action filed in connection with certain consolidated securities cases filed against Hertz (herein, "Ramirez")—was commenced against Hertz, Frissora, and Douglas. *Ramirez* was a class-action lawsuit on behalf of investors who held shares in Hertz during a period including the Restatement Period. The class-action plaintiffs alleged that Hertz and the individual defendants made material misstatements about the Company's financial well- being and its internal controls. The class-action plaintiffs sought the recovery of hundreds of millions of dollars in damages.

102.  Over the course of Hertz's successful legal defense against the plaintiffs' claims, five separate complaints were withdrawn or dismissed in *Ramirez*. On April 27, 2017, Hertz

secured a final dismissal with prejudice of the plaintiffs' claims. That final dismissal was later affirmed by the U.S. Court of Appeals for the Third Circuit on September 20, 2018. However, the *Ramirez* plaintiffs have recently filed a motion seeking relief from the dismissal order based on the SEC findings appearing in the SEC Order, in conjunction with a settlement, pursuant to which Hertz paid a $16 million settlement to the SEC.

12.   103.  Hertz's thus-far-successful legal defense came, of course, at significant expense—

— more than $2527 million— as of the date hereof — because of Defendants' gross negligence and misconduct, as aforesaid.

104. **Shareholder Derivative Demands:**  As a result of Defendants' wrongdoing in breach of the Standards, Hertz's Board received books and records and derivative demands from multiple shareholders. Hertz incurred legal fees as a result of its document productions, investigations, and responses to these demands.

105. Hertz and its Board complied with all applicable duties in investigating and responding to the demands.

106. One demand resulted in a shareholder derivative lawsuit filed on May 30, 2018 against the Company, members of its Board, and Frissora and Douglas in the Court of Chancery for the state of Delaware. Therefore, as a result of Defendants' misconduct and grossly negligent mismanagement, the Company and its Board remain in legal jeopardy from this lawsuit and  other potential shareholder derivative lawsuits.

107. **Federal and State Government Investigations:** As a result of Defendants' misconduct and grossly negligent mismanagement in breach of the Standards, Hertz also faced significant legal liability from two separate federal government investigations, and one state

government investigation.

108. *First*, in June 2014, the SEC informed Hertz that it was under investigation with respect to certain financial improprieties, including    material misstatements.   As a result, the Company underwent an invasive and otherwise burdensome investigation by the SEC, with which it cooperated. On December 31, 2018 Hertz settled with the SEC and paid $16 million dollars to the SEC as a result of the accounting errors detailed in the SEC's findings and this Complaint, and issued the SEC Order, referenced above and attached as Exhibit 2.

109. *Second*, in June 2016, Hertz learned that the U.S. Attorney's Office for the District of New Jersey ("NJUSAO") was investigating the Company as well. As a result, the Company similarly underwent an invasive investigation by the NJUSAO.

110. *Third*, in December 2014, the New Jersey Bureau of Securities informed Hertz that it was under investigation, likewise for financial improprieties, including material misstatements. As a result, the Company underwent an invasive investigation by the New Jersey Bureau of Securities.

111. **Increased Financing and Capital Costs**. Moreover, the delay in the issuance of the Restated Financial Statements adversely affected Hertz's access to capital markets and the cost thereof.

112. **ClawBack Damages.** ClawBack Damages are owed as a result of Defendants' wrongful refusal to return the compensation amounts Hertz has demanded from them, which amounts they are clearly required to return under the terms of the ClawBack Policies and the various agreements pursuant to which they received such monies (that is, certain "Performance Stock Unit" agreements, "Employee Stock Option" agreements, "Price Vested Stock Unit" agreements and Separation Agreements, (as listed in **Exhibit 3** hereto), which expressly note

that those payments were made subject to those agreements).

113.   During the Restatement Period, Defendants, in total, received more than seventy million dollars in incentive-based compensation.  Hertz's Compensation Committee has voted in favor of reclaiming *all* available incentive compensation—as they are entitled to seek under the ClawBack Policies.

114.   Separate from their available incentive compensation during the Restatement Period, each of the Defendants also received certain other incentive-based compensation as a part of their Separation Agreements, including their Golden Parachutes discussed above. The Compensation Committees have also voted in favor of reclaiming Defendants' Golden Parachutes.

115.   The Committees' decision to demand the return of such monies is proper because the Board's Compensation Committee determined in good faith, pursuant to the ClawBack Policies, that it was in the best interests of the Company and that Defendants' misconduct and gross negligence "caused or contributed to" the need for the Restatement. Defendants' disregard for the substantial risk factors *they created* in pursuit of aggressive cost-cutting triggered the need for the Restatement. Defendants' aggressive growth strategy, in combination with Hertz's materially deficient internal controls which they failed to correct, led to the accounting errors, which necessitated the Restatement.

116.   The Committees' decision to demand return of such monies is also proper under the ClawBack Policies because Hertz identified the need for the Restatement within three years of the public filing of the first financials subject to the Restatement—Hertz's fiscal year 2011 Form 10-K, which was filed February 27, 2012. Hertz's Audit Committee identified the need for the Restatement in early November 2014, and informed shareholders of the need for

the Restatement shortly thereafter. Thus, Hertz identified the need for the Restatement within three years of the filing of its fiscal year 2011 financials, and well within three years of the filing of its fiscal year 2012 and 2013 financials.

117.   And, the Committees' decision to demand return of Golden Parachutes is also proper under the 2014 ClawBack Policy.

118.   **Other Contract Damages – the Separation Agreements.** In addition to ~~their~~the contractual duties under the ClawBack Polices, Defendants' various incentive compensation agreements, and Hertz's Standards (which were breached, as described above), Defendants ~~Frissora and Zimmerman~~ represented in ~~each of~~ their <u>respective</u> Separation Agreements, among other things, that they had not "~~engaged in any conduct that constitutes willful gross neglect or willful gross misconduct with respect to [their] employment duties with [Hertz] which has resulted or will result in material economic harm~~" to Hertz, and that ~~[they] had not~~ "facilitated . . . and ha[ve] no knowledge of, any financial or accounting improprieties or irregularities.~~"~~<u>.</u>  Those representations were false—as they *~~had~~ ~~engaged in grossly negligent conduct and knew~~*<u>did then know</u> of accounting improprieties and irregularities, as described above—and constituted a breach of such contracts.

119.   Frissora and Zimmerman further "acknowledge[d] and agree[d]" that Hertz entered into the Separation Agreements "in reliance on th[ose] representations . . . which constitute terms of th[ese] Agreement[s]."

~~Thus~~        120.  <u>Thus, as an alternative theory of recovery</u>, Frissora and Zimmerman are liable to the Company as a result of their breaches of their respective Separation Agreements for, *inter alia*, the monies paid to them pursuant to their Separation Agreements that would not have been paid but for the misrepresentations they each made in their respective Separation

Agreements, as well as the time-value-of-money losses resulting from those payments.

121. **Other Contract Damages – Hertz's Standards.** In addition, all Defendants are liable to the Company for such amounts that resulted from their respective failures to comply with the Standards and the disclosure requirements thereunder, including but not limited to:

a. Legal Fees & Related Expenses: Hertz has incurred significant legal fees and expenses for the Company's internal investigation and the cost of responding to the lawsuits and investigations initiated by the securities plaintiffs, the SEC, the NJUSAO, the New Jersey Bureau of Securities, and shareholder derivative plaintiffs. Those fees and expenses include but are not limited to fees and expenses paid to lawyers, experts, consultants, or other agents retained on their behalf, and attendant costs related thereto, such as document database hosting fees and maintenance.

b. Auditor Review Costs: As a part of Hertz's internal investigation, Hertz suffered the burden of significant costs related to their auditor's subsequent internal review of the Company's finances and fees paid to others to further investigate the Company's finances and the breakdowns in controls that lead to the Restatement.

c. Heightened Costs of Subsequent Audits: As a result of the Restatement, Hertz's independent auditor must conduct significantly more invasive/burdensome audits than it had in years past.

d. Costs of Financing Waivers: As a result of the Restatement, and the attendant delays in filing the Company's 2014 fiscal year financials with the SEC, Hertz was in danger of breaching "timely filer" and other similar covenants in its

debts with third-parties. To avoid breaching its financing arrangements and possibly accelerating the Company's debts, Hertz was forced to secure—at significant cost—waivers for any "timely filer" violations.

e.     Higher Than Necessary Taxes: Defendants' wrongful conduct caused Hertz to report in excess of $200 million in additional pre-tax income to local, state, and federal tax assessors. As a result, Defendants' mismanagement resulted in significantly inflated tax liabilities for the Company throughout the Restatement Period.

122.   Outside of these quantifiable damages, the Company has suffered from significant other costs stemming from the Restatement, including the enormous negative impact Defendants had on the Company's market capitalization and the distraction of management's attention from running the core business to addressing the Restatement processes and related investigations.

123.   All told, the costs to the Company resulting from the remediation of the Restatement matters continue to this day. Defendants' wrongful conduct and gross negligence in breach of the Standards has damaged Hertz in excess of $200 million to date.

## COUNT I

**BREACH OF CONTRACT:  Enforcement of the 2010 ClawBack Policy to recover incentive-based compensation from fiscal years 2011, 2012, and 2013 (against all Defendants)**

124.   Plaintiffs repeat and reallege the allegations set forth above, as though fully set forth herein.

125.   The ClawBack Policy adopted by Hertz in 2010 provides that,

> all determinations and decisions made by the Compensation Committee pursuant to the provisions of this Compensation Recovery Policy shall be ***final, conclusive and binding*** on all persons, including the Company, its affiliates, its stockholders

and employees. [Emphasis added.]

126. The 2010 ClawBack Policy generally provides that Hertz's "executive officer[s]" receiving "any annual incentive, long-term incentive, equity-based award or other performance-based award . . . shall repay or forfeit . . . any [such compensation] received by him or her if" four conditions are met:

:) (a. ) "[T]he payment, grant or vesting of such [incentive-based compensation] was based on the achievement of financial results that were the subject of a restatement . . . as filed with the Securities and Exchange Commission []"; (b. ) "[T]he need for the restatement was identified within 3 years after the date of the … filing of the financial results that were subsequently restated"; (c. ) "[T]he Compensation Committee determines in its *sole discretion*, exercised in good faith, that the executive officer's *gross negligence*, fraud or misconduct caused or contributed to the need for the restatement[]"; and (d. ) "[T]he Compensation Committee determines in its *sole discretion* that it is in the best interests of the Company and its stockholders for the executive officer to repay or forfeit *all or any portion of* the [incentive-based compensation]." [(Emphasis added.].)

127. The terms of the 2010 ClawBack Policy were made clear in various valid and enforceable written agreements which were fully performed by Hertz, and pursuant to which such compensation was awarded to Defendants (that is, certain "Performance Stock Unit" agreements, "Employee Stock Option" agreements, and "Price Vested Stock Unit" agreements), and were otherwise known, understood, and agreed to by each of the Defendants.82. At all relevant times, Defendants were "executive officers" of Hertz subject to the Company's 2010 ClawBack Policy (which remained in effect until amended and restated in 2014).

128.   For the 2011, 2012, and 2013 fiscal years, Defendants each received a substantial amount of incentive-based compensation covered by the 2010 ClawBack Policy, which covered incentive-based compensation paid on or after January 1, 2010. In total, Defendants received more than $70 million in incentive-based pay during this period.

129.   The Compensation Committee determined in good faith that the incentive-based compensation received by Defendants for the 2011, 2012, and 2013 fiscal years was "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement.

130.   Hertz identified "the need for the restatement" in November 2014, which was "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

131.   Based on Defendants' misconduct as set forth above, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Defendants'] gross negligence . . . or misconduct caused or contributed to the need for the restatement," which determination was final, conclusive, and binding on Defendants, and was reflected in a resolution passed on February 11, 2019.

132.   Likewise, Hertz's Compensation Committee determined that "it is in the best interests of the Company and its stockholders for [Defendants] to repay or forfeit **all**" of their inventive-based pay from fiscal years 2011, 2012, and 2013.  [Emphasis added.]

133.   On February 13, 2019 counsel for Hertz contacted counsel for each of the Defendants, informing them of the Compensation Committees' decision and seeking the prompt return of their incentive-based compensation from fiscal years 2011, 2012, and 2013.

134.   Defendants, through their counsel, refused to comply with their obligations

under the 2010 ClawBack Policy.

135.  Accordingly, Defendants have materially breached their obligations under the 2010 ClawBack Policy, and their various incentive compensation agreements, by failing to remit their incentive-based compensation from fiscal years 2011, 2012, and 2013.

13.  As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return.

COUNT  136.  As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return.

### COUNT II

BREACH OF CONTRACT:  Enforcement of the 2010 ClawBack Policy to recover incentive-based compensation in Douglas' Golden Parachute (against Defendant Douglas)

Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

14.  Douglas was party to a valid, enforceable contract entered into with Hertz upon Douglas' anticipated termination from Hertz, namely, Douglas' Separation Agreement.

15.  Hertz has performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of Douglas' Separation Agreement.

16.  As a part of Douglas' Separation Agreement, Douglas received certain incentive-based compensation as a part of her Golden Parachute.

17.  Hertz's Compensation Committee determined in its sole discretion, exercised in good faith, that the incentive-based compensation received by Douglas as part of her Golden Parachute was "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement of its fiscal year 2011, 2012, and 2013 financials.

18.     Hertz identified "the need for the restatement" in November 2014 "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

19.     Based on her misconduct and gross negligence as set forth above, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Douglas'] gross negligence . . . or misconduct caused or contributed to the need for the restatement," which determination was final, conclusive and binding on Douglas and reflected in a resolution passed on February 11, 2019.

20.     The ClawBack demand letter of February 13, 2019, described above, includes the incentive-based compensation paid prior to February 20, 2014.

21.     Accordingly, Douglas has also materially breached her obligations under the 2010 ClawBack Policy by failing to remit her incentive-based compensation received through her Separation Agreement's Golden Parachute.

22.     As a result of such breach, Hertz has been damaged, at a minimum, in the amount of the demanded Golden Parachute monies Douglas has wrongfully refused to return.

COUNT III

**BREACH OF CONTRACT:  Enforcement of 2014 ClawBack Policy to recover incentive-based compensation in Defendants' Golden Parachutes (against all Defendants)**

138.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

137.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

139.138.          As a part of Defendants' Separation Agreements, Defendants received certain

47

incentive-based compensation as a part of their Golden Parachutes, which was paid on or after February 20, 2014.

140.139.      Hertz's Compensation Committee determined in its sole discretion, exercised in good faith, that certain of the incentive-based compensation received by Defendants through the Golden Parachutes in their Separation Agreements were "based on the achievement of financial results that were the subject of" the Company's July 2015 Restatement.

141.140.      Hertz identified "the need for the restatement" in November 2014 "within 3 years after the date of the first public issuance or filing of the financial results that were subsequently restated," which first occurred on February 27, 2012.

142.141.      Based on Defendants' misconduct and gross negligence as set forth above, and on the ClawBack Policy as amended and restated in 2014, which also applied to Defendants, Hertz's Compensation Committee "determined in its sole discretion, exercised in good faith, that [Defendants'] gross negligence . . . or willful misconduct caused or contributed to the need for the restatement," which determination was final, conclusive, and binding on Defendants and reflected in a resolution passed on February 11, 2019.

143.142.      The ClawBack demand letters of February 13, 2019, described above, include the incentive-based compensation paid subject to the amended and restated ClawBack Policy in effect in 2014.

144.143.      Accordingly, Defendants have materially breached their obligations under the 2010 ClawBack Policy, by failing to remit their incentive-based compensation as a part of their Golden Parachutes, which was paid on or after February 20, 2014.

23.    As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return. As a result of such breaches, Hertz has been damaged, at a minimum, in the amount of demanded monies they have wrongfully refused to return.

COUNT IV

144.    BREACH OF CONTRACT

## COUNT III

**BREACH OF CONTRACT: Breach of the Standards of Business Conduct (against all Defendants )**

145.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

24. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

25. The Standards constitutes an enforceable contract with each of Defendants.

146.    The Standards promulgated, and in effect, between 2009 and 2014 constitute enforceable contracts agreed to by each of Defendants.  The terms and requirements of those contracts were further reflected and evidenced by the annual certifications they were required to provide concerning compliance and to disclose any potential violations of law.

145. 147.    Hertz has performed all of the material conditions, covenants, and promises to be performed in accordance with the terms and conditions of the Standards.

148.    The Standards noted that it was "important that we familiarize ourselves with the laws and regulations that apply to our specific jobs" as well as the serious nature of violations of its code, stating as follows (with emphasis added):

Code violations can have severe consequences for both the Company and

49

those involved in the offense. In addition to damaging the Hertz brand, actions that violate our Code may also violate the law. *This subjects the individuals involved* and our Company *to possible* criminal and *civil liabilities*. Failing to follow our Code also means that the Company may take disciplinary action, up to and including termination." [4]

~~146.~~149.     Each Defendant's gross negligence and misconduct as set forth in this Complaint – permitting an improper tone at the top to infect the company which resulted in accounting errors requiring a Restatement and resulting in, *inter alia*, the SEC Order, and failure to disclose the gross negligence and misconduct of the other aforementioned key senior executives, during and for the Restatement Period~~, constitutes~~ – constitute breaches of the Standards~~.~~, as follows below.

150.     **Frissora:** Frissora's conduct, as described in detail above, in setting an inappropriate tone at the top violated the core principals of the Standards, which he espoused when stating that, "[i]t is everyone's responsibility to:

- *Follow* our Code, Company policies and procedures, and the law at all times—even if someone asks us to do otherwise;
- *Uphold* the principles set forth in our Code and Company policies and procedures in all that we do;
- Understand that there is no excuse, including ignorance or "everyone else is doing it," *for acting illegally or unethically*; and
- *Speak up* if we know or suspect that a violation of our Code has occurred." (emphasis added). [5]

151.     The policies and procedures included the Standards' mandate to "Maintain

---

[4] *See, e.g.*, Standards, revised as of Oct. 31, 2012, appearing as part of **Exhibit 4**, at p.4 ("B.5" under the caption "What Laws Must We Know and Follow," and "B.6" under the caption "What Are the Consequences of Code Violations").

[5] *See, e.g.*, Standards, revised as of Oct. 31, 2012, appearing as part of **Exhibit 4**, at p.3 ("B.3" under the caption "What Responsibilities Do We Have Under the Code").

Honest and Accurate Books and Records," as follows:

> "As a publicly-traded company, Hertz shareholders rely on us to maintain accurate records and to submit full, fair, timely and understandable financial disclosures to relevant government agencies and regulatory bodies. Every transaction that we record in our daily business contributes to the overall picture of Hertz's financial status, so it is crucial that we are accurate in all of our ledgers, reports, invoices and receipts. We can ensure utmost honesty in these records by following Company policies and procedures, as well as the laws and regulations that govern our financial accounting and reporting." [6]

152.    Frissora's improper tone at the top was anathema to the Standards, and ultimately led to, *inter alia*, other senior executives violating the Standards, including the foregoing provision (by engaging in improper accounting methodologies and financial reporting) and by failing to report such violations, and ultimately led to the SEC Order and related payment by Hertz of a $16 million penalty, and burdensome and expensive investigations and lawsuits.  His improper tone at the top, obsessing over outside analysts' views and insistence on profits, whatever the cost, as described above and in the SEC's Order,[7] caused wholesale violations of the Standards, in derogation of his heightened responsibilities as the CEO, pursuant to the Standards, which noted that,

> "While our Code applies equally to all of us at Hertz, managers do have additional responsibilities. As leaders, managers are expected to:
>
> - Lead by positive example;
> - Promote an open door policy so employees feel comfortable asking questions and voicing concerns;
> - Train other employees on this Code and relevant Company policies and

---

[6] *See, e.g.*, *Id.*, at p.14 ("F.1" under the caption "We Maintain Honest Books and Records").

[7] As indicated in Exhibit 2 (at p. 2, ¶ 2), the SEC found "inappropriate [accounting] methodologies that occurred in a pressured corporate environment where, in certain instances, there was an inappropriate emphasis on meeting internal budgets, business plans, and current estimates."

procedures;

- Respond to the concerns expressed by employees, escalating issues when necessary; and
- Keep an eye out for misconduct, ***never excusing*** or promoting violations of this Code or the law" (emphasis added). [8]

153.    Frissora's badgering and pressuring of his senior executives (reflected in the improper tone at the top he set) including Zimmerman, Sider, Douglas, and Kapur, was the opposite of "lead[ing]" by positive example, or creating an open-door policy or atmosphere that would make "employees feel comfortable . . voicing concerns," or "keep[ing] an eye out for misconduct, never excusing or promoting violations of this Code or the law."  Indeed, such treatment of other senior executives resulted in financial statements that the SEC found to be inadequate and resulted in, *inter alia*, a $16 million penalty, and thus represents a violation of the Standards' mandate to "Maintain Honest and Accurate Books and Records," as described above.

154.  **Zimmerman:**   As General Counsel, Zimmerman was the principal senior executive in charge of insuring that employees, especially senior executives, comply with the Standards.  Moreover, he personally signed Hertz's SEC 8-Ks, which included the Standards, and as the company's chief legal and compliance officer, he was responsible for the company's compliance with, *inter alia*, legal requirements, including those governing SEC disclosures. [9]

155.   Zimmerman personally witnessed Frissora's improper tone at the top, as a member of Frissora's Senior Management Team, and by participating in weekly meetings of

---

[8] *See, e.g*., Standards, revised as of Oct. 31, 2012, appearing as part of Exhibit 4, at p.3 ("B.4" under the caption "Casting the Right Shadow: Do Managers Have Added Responsibilities").

[9] *See* Hertz's S.E.C. Form 8-K, dated Nov. 22, 2011, which is attached as part of Exhibit 4.

the team.  Moreover, Zimmerman was well aware of the pressurized atmosphere created by Frissora, which increased in intensity when it appeared financial results would not meet expectations.  Yet, Zimmerman did nothing about it – and thereby breached the Standards by failing to "speak up" and report Frissora's misconduct and, in effect, "excusing" Frissora's violations of the Code or the law." [10]

156.   As a result, Zimmerman's failure to act also resulted in a violation of the Standards' mandate to "Maintain Honest and Accurate Books and Records," as described above.  And Zimmerman also breached that mandate, and his obligation to "speak up" by failing to report to the Audit Committee arbitrary changes in various policies that exceeded more than one million dollars of overstated income in Hertz's financial statements during the Restatement Period as set forth in the SEC Order.

157.   And Zimmerman also breached those provisions of the Standards by failing to "speak up" and report to the Board other governance, accounting and financial weaknesses he was aware of, including possible improper payments to Brazilian government officials and, upon information and belief, he approved and/or caused improper adjustments to legal reserves.

158.   Hertz has suffered damages in excess of $200 million as a proximate result of Defendants' breaches of the Standards, consisting of, *inter alia*, increased financial and other costs and burdens resulting from the required Restatement and the various lawsuits and investigations that predictably followed, as well as the predictable cost to Hertz of remedying the continuing impact of those breaches, including increased costs of financing and capital.

---

[10] Indeed, the Standards even calls for mere "possible misconduct" to be reported.  *See, e.g.*, Standards revised as of Oct. 31, 2012, appearing as part of **Exhibit 4**, at p.4 ("C.1" under the caption "Where Do We Go to Make Reports or Seek Advice").  See also SEC Order, Exhibit 2.

159.   Such damages were a direct, natural and otherwise foreseeable consequence of Defendants' breaches, and they were especially foreseeable and predictable given the knowledge and status of Frissora, Douglas and Zimmerman, each being a sophisticated executive managing the Company as, respectively, C.E.O~~., C.F.O~~. and General Counsel. As top managers of the Company, each of them was generally well aware, *inter alia*, that a restatement of financial statements by such a public entity would be an expensive and otherwise burdensome endeavor which would not only require the expenditure of costly accounting/auditing firm fees, but also attract the attention of governmental authorities and class-action lawyers, and result in increased costs of financing and capital.

~~COUNT V~~

~~BREACH OF CONTRACT:~~ **COUNT IV**

**BREACH OF CONTRACT:** **Breaches of Separation ~~Agreement~~ Agreements' Representations** ~~(~~ **(asserted in the alternative to Count III as** against **all** Defendants ~~Frissora and Zimmerman~~)

160.  Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

~~26.~~ 161.      Each of Frissora and Zimmerman ~~each~~, in connection with their respective resignations from Hertz in 2014, entered into a ~~valid, enforceable contract with Hertz, namely, each individual's~~ written agreement – a "Separation Agreement~~.~~" – setting forth the terms and conditions related to their terminations of employment.

162.     Each Separation Agreement contained certain representations, which were explicitly incorporated as terms of ~~that Separation Agreement.~~ such agreement.

163.     The terms of Frissora's Separation Agreement are governed by Florida law. The terms of Zimmerman's Separation Agreement are governed by Delaware law.

164. Hertz has performed all of the material conditions, covenants, and promises to be performed in accordance with the terms and conditions of each of the Separation Agreements.

~~Agreements.~~

~~27.~~ Frissora ~~and Zimmerman~~ represented in ~~their respective~~section 9(b) of his Separation

~~Agreements~~

165.Agreement that ~~they~~he had not ~~engaged in "willful gross neglect"~~ "knowingly violated the Company's Standards of Business Conduct," or "~~willful gross misconduct."~~

~~Frissora and Zimmerman further represented in those agreements that they had not "~~facilitated . . . . . . and ~~ha[ve]~~has no knowledge of, any financial or accounting improprieties or irregularities" within Hertz.

166. Zimmerman represented in section 10(b) of his Separation Agreement that he had not "knowingly violated the Company's Standards of Business Conduct," or "facilitated . . . and has no knowledge of, any financial or accounting improprieties or irregularities" within Hertz.

167. Each of Frissora and Zimmerman also therein "acknowledge[d] and agree[d]"

~~that Hertz~~

that Hertz had entered into ~~their~~his Separation ~~Agreements~~Agreement "in reliance on the[se] representations," which were explicitly incorporated as terms of ~~the Separation Agreements.~~ such agreement.

168. ~~As evidenced by their misconduct described above,~~ Frissora's and Zimmerman's aforementioned written representations were false

because ~~they did engage in "willful gross neglect" and/or "willful gross misconduct" with respect to their employment duties with Hertz, which resulted in material economic harm to Hertz, and also because they~~ each knew ~~of and/or~~he had "facilitated . . . financial or accounting improprieties,~~"~~" (including but not limited to those identified in the Restatement~~.~~

~~28. As evidenced by their misconduct described above, Frissora's and Zimmerman's representations were false, as they engaged~~ and the SEC Order) and otherwise violated the Standards, as described ~~in "willful gross neglect" and/or "willful gross misconduct" with respect to their employment duties with Hertz, and "facilitated . . . financial or accounting improprieties," including but not limited to those identified in the Restatement, both of which resulted in material economic harm to Hertz~~paragraph nos. 150-157 above.

169.    Accordingly, as a result of their respective misrepresentations made in those contracts, each of Frissora and Zimmerman ~~have~~has materially breached ~~their~~his Separation ~~Agreements.~~ Agreement.

170.    Hertz has suffered damages as a proximate result of Frissora and Zimmerman's breaches of their respective Separation Agreements, including, without limitation, the monies paid to them pursuant to ~~their Separation Agreements~~those agreements (which would not have been paid but for ~~Hertz's~~Hertz's reliance on the misrepresentations they made in their respective Separation Agreements), and the time-value-of-money losses resulting from those payments.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

A.    Awarding compensatory damages to Plaintiffs, jointly and severally, in an amount to be proven at trial, including amounts equal to Defendants' ill-gotten incentive pay and

the investigation and remediation costs borne by Plaintiffs as a result of Defendants' wrongful

conduct, including pre- and post-judgment interest;

> B.      Awarding restitution and disgorgement of Defendants' ill-gotten incentive pay

and other profits;

> C.      Declaring that Defendants are not entitled to indemnification by Plaintiffs for any

attorney's fees, costs, and/or any other liability incurred as a result of this litigation;

> D.      Awarding reasonable attorneys' fees and costs of the suit incurred herein; and

> E.      Such other and further relief, whether in law or at equity, as this Court deems just

and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable thereby.


Dated: ~~July 11, 2019~~May 12, 2020                    Respectfully submitted,

                                                       GORDON & REES LLP


                                               By:    *s/Douglas E. Motzenbecker*
                                                       Douglas E. Motzenbecker
                                                       18 Columbia Turnpike - Suite 220
                                                       Florham Park, New Jersey 07932
                                                       973-549-2500 (main)
                                                       973-549-2514 (direct)
                                                       862-432-2678 (mobile)
                                                       973-377-1911 (fax)
                                                       dmotzenbecker@grsm.com

Herbert Beigel
LAW OFFICES OF HERBERT BEIGEL
5641 N. Chieftan Trail
Tucson, Arizona 85750
520-825-1995
520-869-5836 (mobile)
520-844-6215 (fax)
hbeigel@me.com
*Admitted pro hac vice*

Robert Viducich
LAW OFFICE OF ROBERT R. VIDUCICH
40 Wall Street, 28th Floor
New York, New York 10005
Tel: (212) 400-7135
rviducich@rrvlaw.com
*Admitted pro hac vice*

**Attorneys for Plaintiffs**